# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-1960

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ROMAN SKOCZEN,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 95 CR 243-1—**Charles P. Kocoras**, *Chief Judge*.

———————

ARGUED FEBRUARY 13, 2004—DECIDED APRIL 20, 2005

———————

Before FLAUM, *Chief Judge*, and MANION and WOOD,
*Circuit Judges*.

WOOD, *Circuit Judge*.  On April 18, 1995, the police
arrested Roman Skoczen along with several of his associates.
Skoczen was accused and later convicted of conspiring to
possess goods stolen from an interstate shipment and con-
spiring to transport stolen goods in interstate or foreign
commerce. Skoczen appeals from a number of issues stem-
ming from his trial and sentencing. We affirm Skoczen's
convictions. With respect to his sentence, we follow the

limited remand procedure outlined in *United States v. Paladino*, Nos. 03-2296 *et al.*, 2005 WL 435430 (7th Cir. Feb. 25, 2005), so that the district court may determine in the first instance whether the new discretionary sentencing regime established in *United States v. Booker*, 125 S.Ct. 738 (2005), affects the sentence that the court wishes to impose.

## I

Skoczen's downfall began when the United States Customs Service ("Customs" or "Customs Service") began a sting operation in January 1995. At that time, Skoczen, his cousin, Lucas, who was cooperating with Customs agents, and an undercover agent met to explore the possibility of finding a buyer for a trailerload of cigarettes. The undercover agent posed as a thief looking for a buyer for approximately 50,000 cartons of Marlboro cigarettes. Skoczen was interested and specified that he wanted only Marlboro cigarettes that came in a hard pack. In February 1995, in preparation for the arrest, the agents borrowed approximately 325,000 packs of cigarettes from a Philip Morris facility in Virginia. To get them to Illinois, a Customs agent drove to Richmond, Virginia, in a Customs department trailer, picked up the cigarettes, and drove them back to Illinois. Customs parked the trailer in a warehouse until it was time to deliver them to Skoczen and his co-conspirators.

Several more meetings and negotiations followed the original January meeting, culminating in a final meeting with undercover agents on April 18, 1995. Skoczen had arranged to buy approximately 500,000 packs of cigarettes at $0.20/pack, or $100,000. The agents met Skoczen and his associates in a parking lot where they were to inspect the contents and unload the trailer. When they satisfied themselves that everything was in order, they paid the agents. Skoczen's associate unhooked the trailer from the Customs' tractor and hooked it to his own tractor. The agents then arrested Skoczen and his associates.

Following his initial appearance in court on April 19, 1995, Skoczen was released on bond. The court ordered him to appear for a preliminary hearing on April 24, 1995 but he did not show up. Instead, Skoczen fled to Florida where he lived under an assumed name until he was arrested there in June 2001. Skoczen was charged with conspiring in violation of 18 U.S.C. § 371 to receive and possess goods stolen from an interstate shipment, in violation of 18 U.S.C. §§ 659 and 2314 (Count I), and receiving, possessing, and purchasing contraband cigarettes, and attempting to do so, in violation of 18 U.S.C. §§ 2 and 2342(a) (Count II). Skoczen moved to dismiss Count II, but the district court denied the motion on May 14, 2002.

Skoczen's trial began June 17, 2002. The jury returned a guilty verdict on June 21, 2002. The district court sentenced Skoczen to a 60-month term of imprisonment on Count I and an 8-month term of imprisonment on Count II, to be served consecutively. Skoczen's appeal raises issues related to both his trial and his sentence.

## II

### A

Skoczen's first point is that the government failed to prove that the cigarettes he was to receive were actually in interstate commerce, as required by 18 U.S.C. § 659. His theory is that the government manufactured "jurisdiction" (more accurately, its proof of this element of the crime) because government agents moved the cigarettes from Virginia to Illinois, and they did so for the purpose of creating federal jurisdiction in this case. (We note again that interstate commerce requirements like the one in § 659 set forth elements of the federal crime, not jurisdictional requirements in the strict sense of the term. See *United States v. Martin*, 147 F.3d 529, 531-32 (7th Cir. 1998).) Skoczen

maintains that if the cigarettes did not travel in "real" interstate commerce then he did not commit a federal crime.

The government responds first that the cigarettes legitimately traveled in interstate commerce for purposes of the statute when the Customs agents brought them to Illinois from Virginia. In its view, the reason why the shipment crossed state lines, or the identity of those who moved them, makes no difference for purposes of proving the statutory interstate commerce element. Second, the government argues that it needed only to prove that Skoczen believed the cigarettes he was to receive had been transported in interstate commerce. While this second argument may be correct, it was not the government's theory at trial.

Congress designed the interstate commerce element of 18 U.S.C. § 659 merely to justify federal authority over the crime. A defendant does not need to know that the stolen property that he received was stolen from an interstate shipment. He need only know that the property he received was stolen. *United States v. Zarattini*, 552 F.2d 753, 760 (7th Cir. 1977). Thus, in this case, the government did not have to show that Skoczen knew that the cigarettes had traveled to Illinois from another state, as long as the cigarettes actually did travel interstate.

Skoczen and his co-conspirators requested a trailerload of 500,000 packs of cigarettes, specifically Marlboros in a hard pack. In response to his request, the government borrowed 325,000 packs of cigarettes from Philip Morris in Virginia and drove them to Illinois. There is no indication here that the government was manipulating the transaction so that it would create interstate movement of goods. If we had a case, for example, where someone wanted to steal stereo components that she knew were in an Illinois warehouse, and law enforcement agents took the equipment, put it in a truck, drove the truck into Indiana, and then returned to Illinois, matters might be different. The interstate com-

merce element of the statute would be a concern because the object of her crime was something she knew to be located in Illinois and she had no reason to think it would cross state lines. Skoczen, in contrast, sought to steal wholesale quantities of cigarettes—a product that is not made in Illinois and must be imported from another state or country.

Nonetheless, Skoczen compares his case to that of *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). *Archer* arose from an investigation into corruption in the New York criminal justice system. The federal government set up a sting operation trying to catch corrupt attorneys, judges, prosecutors, and others. The defendants were arrested and charged under the Travel Act, 18 U.S.C. § 1952, for using a facility in interstate commerce (a telephone) with intent to promote or carry on unlawful activity. The only interstate activity was three phone calls. Two times the agent called one of the defendants from out-of-state, and once the defendant called the agent, but only after the agent called and asked the defendant to call him back. On appeal, the defendants argued that the three phone calls were insufficient to satisfy the commerce element of the statute, and the court agreed. Two of the phone calls could not be said to have promoted unlawful activity, as they were to tell a defendant where to find the undercover agent. That left one call. The court found that the call served no purpose that could not equally have been served if made from New York. The agents also placed the call themselves, which raised the question whether receipt of an interstate phone call was sufficient. The essentially local nature of the investigation also disturbed the court.

No case has ever turned on the principle set forth in *Archer*. The closest is the second case to which Skoczen refers us, *United States v. Brantley*, 777 F.2d 159, 163 (4th Cir. 1985). In *Brantley*, the FBI had set up a fake gambling establishment staffed by FBI agents. The establishment then hired the defendants for protection. The defendants

were arrested for violating the Hobbs Act, 18 U.S.C. § 1951, on the theory that the gambling equipment and liquor had been transported across state lines. The Fourth Circuit held that because the purpose of the interstate transportation was not commercial, the Hobbs Act was not violated. The extortion had not taken place in interstate commerce. *Id.* at 161-63.

The crimes at issue in *Archer* and *Brantley* were local crimes, made interstate only by actions of the government that could not have been foreseen or intended by the defendants. That is not Skoczen's situation. Skoczen's contacts told him that the trailer was coming from the south and that it might have a GPS locating device on it. He repeated his desire for a trailer of fresh Marlboros. Had the government used a trailer already traveling interstate and diverted it for the purpose of this sting, no one could have questioned the *bona fides* of the interstate commerce element. It is not even clear that there would be a serious issue if Philip Morris had shipped the cigarettes from Virginia to Illinois for purposes of this sting. We have explained *Archer* in the past as follows: "maybe the result in *Archer* is best explained on the ground that the facts did not show a federal crime. [The undercover agent's] use of the telephone was hardly the sort of thing that Congress had in mind in passing the Travel Act, and the court attached no significance to the fact that [the defendant] had returned [the agent's] calls rather than being in to receive them when they were made." *United States v. Podolsky*, 798 F.2d 177, 181 (7th Cir. 1986). Moreover, the *Archer* court made clear that it interpreted the Travel Act narrowly partly because of the intrusive use of federal power in that case, in which federal agents deceived the state's police, courts, and grand jury. See *United States v. Anderson*, 809 F.2d 1281, 1288 (7th Cir. 1987).

Declining to find that the government had manufactured interstate commerce in *Podolsky*, when the government in-

duced the defendant to direct his behavior at an inhabited, rather than vacant, building so as to be sure it was within the scope of the federal statute, we speculated that "investigative conduct not forbidden by any specific doctrine might be so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," although we found that the facts in *Podolsky* did not justify invoking any such rule. Later, in *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995), we stated even more clearly that the doctrine of "outrageous government misconduct" as an independent ground for ordering a new trial in a federal criminal case does not exist in this circuit.

In light of *Boyd*, Skoczen's argument cannot succeed. He knew that the goods he wanted came from out of state (he thought "Carolina" instead of Virginia, but that makes no difference). This reveals that he had no expectation that there was an in-state source of fresh Marlboro cigarettes. In procuring the load, the government merely was "afford[ing] the opportunity and facilities for the commission of the offense charged; the participants were awaiting any propitious opportunity, and never considered themselves limited by boundaries." *United States v. Gardner*, 516 F.2d 334, 344 (7th Cir. 1975) (citations omitted). The cigarettes had to come from out-of-state and Skoczen knew this. The government's borrowing of a trailer of cigarettes from outside Illinois did not alter Skoczen's understanding or expectation. See also *United States v. Peters*, 952 F.2d 960, 963 & n.6 (7th Cir. 1992) (finding a manufactured jurisdiction defense inapplicable where a defendant freely participates in the "jurisdictional" act).

The government argues in the alternative that Skoczen's *belief* that he was receiving goods stolen from an interstate shipment is sufficient. As we noted earlier, the government did not specifically rely on this theory at the trial. Although Skoczen did argue in the district court—as he had to—that

he did not intend to receive cigarettes stolen from an interstate shipment and perhaps thus implicitly addressed the question of his understanding about the shipment, we will err on the side of caution and assume that he might have approached the issue differently had he realized that the government was relying in the alternative on his belief that interstate commerce was involved. On that assumption, we decline to address the point here. It is unnecessary in any event, because we have already found that the goods did move in interstate commerce, and that Skoczen knew that they had done so.

Finally, Skoczen argues that even if we are to find that the goods traveled interstate for purposes of § 659, the shipment had come to rest and was no longer an interstate shipment. The determination of whether a shipment has come to rest is a practical one. *United States v. Parent*, 484 F.2d 726, 728 (7th Cir. 1973). An interstate shipment "lose[s] its characteristic as such [when] it arrives at its final destination and is there delivered." *United States v. Petit*, 841 F.2d 1546, 1551-52 (11th Cir. 1998) (citations omitted). The determination depends on "the relationship between the consignee, consignor, and carrier, the indicia of interstate commerce at the time the theft occurs, and the preservation of congressional intent." *Id.* at 1551. No single factor is dispositive.

The bill of lading lists Philip Morris as the consignor and the consignees as the Bureau of Alcohol, Tobacco, and Firearms, and the Customs Service. Because the Customs Service had taken the shipment and placed it into storage, Skoczen contends that the shipment had lost all indicia of interstate travel. The district court found that because Skoczen himself was to be the final recipient of the cigarettes, the shipment was merely in storage for a period of time until the cigarettes could be delivered. A shipment can stay in storage for a period of time without breaking its interstate character. See, *e.g.*, *id.* at 1552-53. Here, the

Customs Service brought the cigarettes to Illinois from Virginia in order to pass them on to Skoczen. Until that delivery had occurred, the shipment was not complete. Although the Customs Service is listed as consignor on the bill of lading, that is just one factor to take into account. Congress intended § 659 to protect interstate commerce. To give effect to that purpose, we must take a more pragmatic view of what it means to be in shipment and to whom and where the goods are to be delivered. As a practical matter, the intention was always to deliver these cigarettes to Skoczen. We find that the shipment was still in progress until Skoczen was ready to take delivery and therefore that this element of the statute was satisfied.

## B

Next, we consider Skoczen's challenge to the jury instruction on the interstate commerce element. We review *de novo* the district court's decision not to instruct the jury on a theory of defense. *United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003). Skoczen submitted an instruction that read:

> In order to sustain the conspiracy charge of Count One, alleging the theft from an interstate shipment, the government must prove beyond a reasonable doubt that the goods were part of interstate commerce.

The district court refused to give the instruction, on the ground that its substance was covered by an instruction defining interstate commerce as "movement across state lines." It had also included an instruction that set forth the statutory language of § 659 and an instruction on the elements of conspiracy. Skoczen argues these instructions were inadequate, because the jury was not told that the government had to prove the existence of interstate commerce beyond a reasonable doubt.

This argument overlooks the general instruction telling the jury that it had to find each element of the crime beyond a reasonable doubt. Naturally, this included the interstate commerce element. Though the district court did not single out the interstate commerce element, we fail to see how that matters. Either the jury believed the government met its burden as to interstate commerce, or it did not. Without proof of each element, the jury was required to return a not guilty verdict. Because it found Skoczen guilty, it must have found beyond a reasonable doubt that interstate commerce was involved in his crime.

Skoczen claims that the court invited the jury to convict without finding whether the shipment of cigarettes was a part of interstate commerce. But the instruction we quoted above belies this point. This is just another way of presenting Skoczen's real argument, which is that the government manufactured jurisdiction and that the travel was not "real" because it occurred at the hands of the government. We have already disposed of that contention, which in any event is a legal point, not a factual question for the jury to answer.

Skoczen also sought a jury instruction on whether or not the shipment had come to rest and so lost its interstate character. The district court found there was insufficient evidence to support the proposed instruction. Skoczen's only "evidence" to support his theory was that the consignee on the bill of lading was the Customs Service. Because the goods had been delivered to Customs, he urged, they must have come to rest as a matter of law. No rule of law, however, makes delivery to the named consignee conclusive. Imagine how easy it would be to avoid liability, by furnishing false names, misleading intermediaries, or the like on bills of lading. As we have already noted, delivery to the named consignee is merely one fact to take into account. Skoczen had no other evidence to suggest that anyone other than him was the intended final recipient for purposes of

the interstate shipment. The district court was well within its discretion to refuse Skoczen's proposed instruction.

## C

Skoczen was also charged with conspiring to transport stolen goods in interstate or foreign commerce, in violation of 18 U.S.C. § 2314. With respect to this charge, Skoczen argues that because he never actually transported the cigarettes anywhere, he could not have violated the law.

In *United States v. Rose*, 590 F.2d 232 (7th Cir. 1978), this court held that in order to sustain a conviction for conspiracy to transport in interstate commerce stolen goods in violation of 18 U.S.C. § 2314, the defendant need not actually transport the goods in interstate commerce, but merely can intend to transport the goods. 590 F.2d at 236; see also *United States v. Lehning*, 742 F.2d 1113, 1115 (7th Cir. 1984). Proof that Skoczen intended to transport the cigarettes in interstate commerce is all the law requires.

## D

Next, Skoczen argues that the evidence was insufficient to support his conviction for conspiring to violate § 2314. In reviewing a conviction for sufficiency of the evidence, we consider the evidence in the light most favorable to the government. *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000). Reversal is appropriate only where the record contains no evidence from which the jury could have found guilt beyond a reasonable doubt. *United States v. Kosth*, 257 F.3d 712, 718 (7th Cir. 2001).

There was ample evidence in the record to support Skoczen's conviction. Skoczen himself stated that the cigarettes were to be transported overseas. Though he now claims that this was only "speculation" on his part, the jury

heard the recorded conversation in which he said that the cigarettes were "going out of country," and "going to, east, far away from here." Witkowski, an unindicted co-conspirator, testified that he believed that Podmanski, another co-defendant, would ship the cigarettes to Poland. Because no one but Podmanski, who did not testify, and his financial backers would have known for certain where the cigarettes were intended to go, Skoczen believes that the jury could only speculate that the cigarettes were intended for out-of-state commerce. That speculation is enough, however, because the evidence the jury heard indicated that everyone in the conspiracy intended to sell the cigarettes overseas. Although no one could know for certain until the first sale occurred, a conviction does not require that level of certainty. There is enough evidence to support the jury's determination that Skoczen conspired to have the illegal cigarettes transported to either Canada or Poland.

E

Skoczen also complains that the district court erroneously refused to dismiss Count II of the indictment, which charged a violation of the Contraband Cigarette Trafficking Act (CCTA), 18 U.S.C. § 2342(a), and his motion for judgment of acquittal on that count. We review *de novo* a district court's denial of a motion to dismiss an indictment. *United States v. Aldaco*, 201 F.3d 979, 982 (7th Cir. 2000). As we have already noted, when reviewing an attack on the sufficiency of the evidence, we draw all inferences in favor of the jury's verdict.

The CCTA makes it a crime "knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." Contraband cigarettes are defined as a quantity of over 60,000 cigarettes that bear no evidence of payment of applicable state taxes in the state in which they are found. 18 U.S.C. § 2341(2).

The Illinois Cigarette Tax Act (ICTA) requires taxes to be paid on each pack of cigarettes. "Payment of the taxes imposed by Section 2 of this Act shall . . . be evidenced by revenue tax stamps affixed to each original package of cigarettes." 35 ILCS 130/3. The ICTA also requires taxes to be paid: "Collection of the tax shall be evidenced by a stamp or stamps affixed to each original package of cigarettes." 35 ILCS 135/3. The distributor is responsible for paying the tax and affixing the stamp, and then it collects reimbursement from the retailer. Skoczen asserts that the cigarettes he possessed were not subject to Illinois cigarette taxes because he is not a "distributor" as defined in Illinois law and because he did not intend to distribute the cigarettes in Illinois.

Since Skoczen was not a distributor, he takes the position that he was not in violation of the Illinois Act and consequently could not have been in violation of the federal statute. Skoczen is incorrect. The federal statute makes it a crime for any person knowingly to possess contraband cigarettes. The statute defines "contraband" as those cigarettes "which bear no evidence of the payment of applicable State cigarette taxes in the State where such cigarettes are found, if such State requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes." 18 U.S.C. § 2341(2). The federal statute does not require the person possessing contraband to be the one in violation of the state law. Although a violation of state cigarette tax law may be a predicate to a CCTA violation, *United States v. Gord*, 77 F.3d 1192, 1193 (9th Cir. 1996), that does not mean the individual violating the federal law must also be in violation of the state law. In other words, although a distributor may be liable under state law for not paying cigarette taxes, anyone in possession of those cigarettes is in violation of federal law, assuming satisfaction of the other statutory criteria. The federal law does not apply only to the person

whom the state law requires to pay the stamps, but to anyone who possesses more than 60,000 cigarettes without the stamp in violation of the state tax law.

Skoczen also claims that because the only sections of the act listed in the indictment are 35 ILCS 130/3 and 35 ILCS 135/3, the government had to prove that he was a distributor or manufacturer, the two types of businesses addressed by those sections. Not so. The federal law requires that the *state* require a tax, otherwise the cigarettes are not contraband. The indictment lists the portion of the Illinois Code requiring a cigarette tax and stamp. Those sections of the Illinois Code are not listed to show what laws Skoczen violated, but simply to establish that Illinois indeed requires a cigarette stamp.

Skoczen also claims that he was not violating the Illinois cigarette tax laws because the indictment alleged that the cigarettes were to be sold out of the state and never within Illinois. This, however, is irrelevant. The federal statute makes it a crime to possess cigarettes where the applicable tax has not been paid. Skoczen does not fit into any exceptions to the Illinois laws that would allow him to possess cigarettes without a stamp. The administrative provisions that guide application of the Illinois statutes are equally inapplicable. Those provisions make clear that *distributors* who are shipping cigarettes from Illinois outside of Illinois do not have to pay the tax. See 86 Ill. Admin. Code §§ 440.170, 450.70. As Skoczen himself notes, he is not a distributor, and so those provisions do not apply to him.

Skoczen proposed a variety of jury instructions that reflected his theories about § 2342(a). The court denied all of them. Because his proposed instructions were not accurate statements of the law, the district court correctly rejected them.

### F

Skoczen's next point relates to the evidence admitted at trial. He argues that the district court erred by permitting the government to introduce evidence of his flight. We review a district court's decision to admit evidence of flight only for abuse of discretion. *United States v. Robinson*, 161 F.3d 463, 466-67 (7th Cir. 1998).

If the defendant so requests, the prosecution will be required to give notice before the introduction of any "bad act" evidence, though the court can excuse the lack of notice for good cause. Skoczen and the government agreed that the government would provide notice of its intention to use such evidence one week before trial. The government gave no such notice until the trial, however, when it suddenly announced its intention to introduce evidence of Skoczen's flight. Skoczen objected both that this was too late and that the probative value of the evidence was outweighed by its prejudicial effect.

The government argued, over the objection of Skoczen's counsel, that Skoczen (and his lawyer) were aware of his flight and that the defense had been on notice that the government's physical evidence of flight, Skoczen's Florida driver's license, was available for review at any time. Although Skoczen could hardly dispute this, he was not aware that the government intended to use this evidence at trial. The point of the pretrial notice is to prevent undue prejudice and surprise by giving the defendant time to meet such a defense.

Although we agree with Skoczen that the government should have provided proper notice, Skoczen has not explained how he was prejudiced by the lack of notice. Moreover, Skoczen could have asked for a continuance, but he did not. See, e.g., *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1241 (10th Cir. 1996). The government's presentation was brief: one Customs agent testified that Skoczen was not

present at the preliminary hearing and that the court ordered an arrest warrant on April 24, 1995, and then he identified a Florida driver's license issued August 31, 1995 for Skoczen, but in a different name. Because Skoczen did not show any prejudice from the lack of notice and because the evidence introduced by the government was so minimal, we find no reversible error in the district court's decision to admit the evidence.

Skoczen also argues that the evidence of his flight was unduly prejudicial. See FED. R. EVID. 403; see also *United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995). Evidence of flight and concealment may be admissible to show consciousness of guilt, as well as guilt itself. *United States v. Solomon*, 688 F.2d 1171, 1176 (7th Cir. 1982); *United States v. Jackson*, 572 F.2d 636, 639 (7th Cir. 1978). The test set forth in *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977), governs the admissibility of circumstantial flight evidence. The probative value of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir. 1993).

There is ample evidence in the record to support an inference that Skoczen fled from Chicago to Florida because of his guilt. Although flight alone cannot be the only evidence the government puts forth to show guilt, *United States v. Grose*, 525 F.2d 1115, 1120 (7th Cir. 1975), in Skoczen's case there was far more. Indeed, there was overwhelming direct and circumstantial evidence of his guilt: numerous taped conversations between Skoczen and the agents; testimony by Skoczen's co-conspirators; identifications by various government agents of Skoczen and his role in the

conspiracy; and lastly, Skoczen's disappearance immediately after he posted bond. In light of all of this, we need not decide whether the court should have excluded the evidence of flight; even if it was prejudicial in the sense Rule 403 uses the term, any prejudice was harmless under the circumstances.

## G

Skoczen also complains about the district court's instruction on flight. A district court's decision regarding jury instructions is reviewed for an abuse of discretion. *Hendricks*, 319 F.3d at 1004. A jury instruction will not be disturbed on appeal if the instruction fairly and accurately summarizes the law and has support in the record. *Id.* The district court instructed the jury on Skoczen's flight as follows:

> The intentional flight or concealment of a defendant immediately after the commission of a crime, or after he is accused of a crime that has been committed is not, of course, sufficient to in itself establish his guilt; but it is a fact which, if proved, may be considered by the jury in light of all the other evidence in the case in determining guilt or innocence.

Skoczen believes that he was prejudiced by this instruction because it gave too much weight to the flight evidence and encouraged the jury to infer guilt from the fact that he had fled. The instruction was not so one-sided, however. Although it allowed the jury to consider the flight evidence, it also warned the jury about the limits of such evidence. We see no reversible error in the court's decision to give this instruction.

## III

Finally, we come to Skoczen's sentencing issues. He complains about three things: first, that he should not have

received a four-level enhancement for being a leader or org-anizer; second, that the amount of loss the district court calculated was erroneous; and third, that the court erred in determining his criminal history category. The Supreme Court's decision in *United States v. Booker*, *supra*, affects all three of these arguments. Because Skoczen did not raise any *Booker*-related point before the district court, but he did file a supplemental brief after the Supreme Court decided *Blakely v. Washington*, 124 S. Ct. 2531 (2004), the plain error standard of review applies. We therefore are or-dering a limited remand to the district court in accordance with *Paladino*, so that the court may consider whether it would have imposed a different sentence or the same one, had it known that the Sentencing Guidelines were advisory only.

We comment, however, on the merits of Skoczen's three arguments under the Guidelines because the Guidelines do retain force even though they are no longer mandatory, and thus errors in their application remain relevant. Even under an advisory regime, if a district court makes a mistake in calculations under the Guidelines, its judgment about a reasonable sentence would presumably be affected by that error and thus (putting aside the implications of plain error review) remand would be required just as before.

Skoczen's first argument is that the record did not sup-port the court's decision to adjust his offense level upward by four notches under U.S.S.G. § 3B1.1(a). That section provides for an increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Skoczen urges that he was more like a middleman or broker, not the top man. But his interpretation of the Guideline is too narrow. Organizers "do not necessarily control anyone but none-theless influence the criminal activity by coordinating its members." *United States v. Reneslacis*, 349 F.3d 412, 417 (7th Cir. 2003). The district court found that Skoczen was

much more than a middleman who brought together willing sellers and buyers. Instead, the court found Skoczen conducted meetings to establish the terms of the deal, including product and price; he recruited a lead buyer who was putting together a group to purchase the full shipment; and he determined the details and logistics of the delivery. In *United States v. Cochran*, 955 F.2d 1116 (7th Cir. 1991), we upheld an upward adjustment under § 3B1.1(a) for a defendant who had played a similar "central role in coordinating the five individuals." We find no error, clear or otherwise, in the district court's characterization of Skoczen's role in the offense.

Second, Skoczen attacks the district court's calculation of the amount of loss on which his sentence was based. See U.S.S.G. § 2B1.1. The evidence showed that he intended to purchase 480,000 packs of cigarettes, valued at $421,920, but that there were only 324,600 packs in the trailer, valued at $285,323 (in each case, a value of about $1.14 per pack). He argues that the district court should have based his sentence on the lower value, because he intended only to purchase the cigarettes that were in the trailer, whatever that number was. (In fact, the conspirators intended to pay $0.20 per pack for the stolen goods, so their actual outlay would have been lower than the value of the goods, but Skoczen does not claim that the theft value of the goods should govern.) There was ample evidence before the district court, however, to support a finding that he *intended* to purchase 480,000 packs of cigarettes with a value of $421,920, and that is enough to support the use of the higher dollar amount under U.S.S.G. § 2B1.1. See commentary n.2(a)(ii) (clarifying that intended loss includes "intended pecuniary harm that would have been impossible or unlikely to occur . . . as in a government sting operation").

The issue with respect to Skoczen's criminal history category requires additional comment. The Supreme Court has held that sentencing adjustments related to recidivism, in

the context of applying statutory classifications, do not raise the same Sixth Amendment issues as other sentencing points. See *Almendarez-Torres v. United States*, 523 U.S. 224 (1998); but see *Shepard v. United States*, 544 U.S. ___, ___ (March 7, 2005) (slip op. at 2) (Thomas, J., concurring) ("*Almendarez-Torres* . . . has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided."). Although the Court had no occasion in *Booker* to focus on the calculation of criminal history under the Guidelines, its remedial opinion in *Booker* did not distinguish between calculations related to offense level and calculations related to criminal history. Instead, it chose to strike down the underlying statutory provisions that made the Guidelines mandatory, 18 U.S.C. §§ 3553(b)(1) and 3742(e), rejecting the government's arguments for different intermediate solutions. This indicates to us that the assessment of criminal history for purposes of applying the Guidelines (as opposed to a statutory sentencing range) is also something that falls within the *Booker* rule. It is therefore in that light that we consider Skoczen's argument that his conviction for retail theft in the Circuit Court of DuPage County should not have been included in his criminal history.

If a local ordinance violation is also a violation under state criminal law, the ordinance violation is properly included in calculating the defendant's criminal history. U.S.S.G. § 4A1.2, commentary n.12; *United States v. Milquette*, 214 F.3d 859, 863 (7th Cir. 2000) ("§ 4A1.2(c)(1) actually requires courts to include ordinance violations that are also criminal offenses under state law."). In Illinois, retail theft is not only a local crime; it is also a violation under state criminal law, 720 ILCS 5/16A-3. Thus, this conviction was properly included in Skoczen's criminal history. This is true regardless of the quasi-criminal or quasi-civil nature of the ordinance violation. That Skoczen's prior conviction was

entered *ex parte* is also irrelevant. *United States v. Jiles*, 102 F.3d 278 (7th Cir. 1996). What matters is only whether the local ordinance violation punishes behavior that the criminal law also addresses, which is the case here. We thus find no error in the district court's assessment of Skoczen's criminal history.

## IV

We AFFIRM the judgment insofar as it relates to Skoczen's convictions. With respect to his sentence, we order a LIMITED REMAND to the district court for further proceedings consistent with *Paladino* and this opinion. It will be up to the district court to indicate whether it is still inclined to impose the same sentence or if it believes that a different sentence would be the reasonable one to impose, in light of all relevant sentencing considerations (including but not limited to what we have said about its applications of the Guidelines). Pending the outcome of the limited remand, this court will retain jurisdiction over the appeal.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*