In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1505

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MONICA HERNANDEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00949-2 — **Virginia M. Kendall**, *Judge.*

ARGUED MARCH 3, 2020 — DECIDED MARCH 10, 2020

Before EASTERBROOK, KANNE, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A jury found Monica Hernandez guilty of mail fraud for her participation in a fraudulent mortgage trust company. Hernandez appeals her conviction, arguing that the government did not prove that she used the mails in furtherance of the scheme to defraud. Her sentence also includes sizable restitution, and she contends that the district court improperly delegated its authority to the Bureau of Prisons by not entering a specific payment schedule for her to

follow while serving her prison sentence. But sufficient evidence supports the mail fraud convictions, and the district court permissibly deferred Hernandez's restitution payments until after her release, so we affirm the judgment.

## I. Background

Because Hernandez challenges the sufficiency of the evidence supporting the jury's verdict, we recount the evidence in the light most favorable to the prosecution. *See United States v. Kelerchian*, 937 F.3d 895, 907 (7th Cir. 2019). Monica Hernandez cofounded Washington National Trust in 2011 and marketed it as a legitimate company designed to assist homeowners struggling to pay their mortgages. She and her codefendants promised prospective "members" that, in exchange for fees between $3,500 and $10,000, the Trust would negotiate with their lenders to take over their mortgages and stop or prevent foreclosure proceedings. The Trust promised to refund the fees if it could not purchase the mortgages and asserted that the arrangement would greatly reduce the balance of the homeowners' mortgages.

More than 50 homeowners became members of the Trust. When they agreed to work with the Trust, they signed membership documents and paid all or part of the Trust's fees, usually in person. (If a homeowner was unable to pay the fees up front, he or she could make installment payments.) A packet consisting of the membership agreement, deed, receipt of payment, and other materials related to the Trust was then mailed to the homeowners or made available for pick-up. Once new members signed their paperwork, Hernandez told them, they could be relieved that the Trust would help them retain their homes.

Several homeowners paid installments to the Trust after
their membership packets arrived in the mail. Indeed, at least
three homeowners who could not afford the Trust's fees up
front received payment schedules with their membership
packets. Two such homeowners became the basis for Count 1
and Count 4 of the indictment. A third homeowner, the sub-
ject of Count 2, received a handwritten payment schedule in
the mail, but he decided to complete his payment in one lump
sum. And though the third homeowner paid his fees to the
Trust, he received a court summons to appear for foreclosure
proceedings months after he had signed the membership
agreement. This was not unusual; but when homeowners ex-
pressed concern about the pending foreclosure proceedings,
Hernandez and her codefendants reassured them that the
Trust would abide by the agreement.

The true nature of the Trust became known in 2013 when
Illinois authorities discovered that the Trust was not licensed.
Nor did the Trust have enough funds to purchase a single
mortgage. Instead, Hernandez and her codefendants had
spent the membership fees on meals, travel, and vehicle pur-
chases. Though it collected fees totaling over $220,000 from at
least 50 homeowners over the course of two years, the Trust
did not help any homeowners reduce their mortgage pay-
ments, and at least three homeowners who paid the Trust had
their homes foreclosed on. Later in 2013, a grand jury indicted
Hernandez and two codefendants for mail fraud.

At trial, the government proposed a jury instruction on a
"lulling" theory of mail fraud, which stated that communica-
tions that lull a victim into a false sense of security after being
defrauded can support a finding that the defendant used the
mails in furtherance of the scheme to defraud. The court

refused the instruction because the government had not presented evidence that the mailings lulled any victim into a false sense of security. The court did, however, agree to instruct the jury that communications that assist a defendant in avoiding detection of the scheme to defraud may be sufficient to support a finding that the defendant used the mails in furtherance of the scheme. Hernandez did not object to that proposed instruction.

In its closing argument, the government urged the jury to find Hernandez guilty of three counts of mail fraud based on the mailing of the membership packets to three victim-homeowners. (The government moved to dismiss one count from the four-count indictment before the close of trial.) Hernandez, in turn, argued that the mailings did not further the scheme to defraud because they were sent after the victims signed their membership agreements—in other words, after the fraud was complete. The jury returned a guilty verdict on all three counts.

Hernandez moved for a judgment of acquittal or a new trial. *See* Fed. R. Crim. P. 29, 33. She maintained her argument about the timing of the mailings: Because the homeowners' deals with the Trust were completed upon signing the agreements, the later mailings of the membership documents were not in furtherance of the scheme to defraud. The district court denied Hernandez's motions, concluding that sufficient evidence supported the jury's finding that the mailings contributed to the scheme and helped prevent its detection.

Hernandez was sentenced to 60 months in prison, one year of supervised release, and was ordered to pay, jointly and severally with her codefendants, nearly $260,000 in restitution to her victims. She requested that the court establish a

payment plan for her while in prison, limiting her to paying no more than ten percent of her monthly prison income. At the sentencing hearing, however, the court orally declined to order Hernandez to begin paying while in prison. The written judgment reflected that pronouncement, as the court established a schedule beginning upon Hernandez's release:

> [Y]ou shall pay any financial penalty that is imposed by this judgment that remains unpaid at the commencement of the term of supervised release. Your monthly payment schedule shall be an amount that is at least 10% of your net monthly income, defined as income net of reasonable expenses for basic necessities such as food, shelter, utilities, insurance, and employment-related expenses.

And the check box on the judgment form that sets forth a payment schedule during imprisonment was left unchecked.

## II. Discussion

On appeal, Hernandez challenges her conviction on the ground that the government presented insufficient evidence that she used the mails in furtherance of the fraudulent scheme. She also contends that the district court erred in failing to set a schedule of restitution payments to be made during her term of imprisonment.

### A. Sufficiency of the Evidence

We review de novo the denial of a defendant's motion for acquittal, asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Kelerchian*, 937 F.3d at 907. Hernandez challenges the sufficiency of the evidence supporting the second element

of mail fraud, namely, that "the use of the mailing system for the purpose of executing the scheme." *United States v. McClellan*, 794 F.3d 743, 751–52 (7th Cir. 2015); *see* 18 U.S.C. § 1341. She argues that no evidence shows the mailings of the membership packets were for the purpose of executing the scheme to defraud because numerous victims testified that they believed their business with the Trust was complete once they signed their membership agreements—before the defendants mailed any documents.

We have stated that "[a] mailing is not 'in furtherance' if the scheme has already reached fruition at the time of the mailing." *United States v. McClellan*, 868 F.2d 210, 216 (7th Cir. 1989). But Hernandez ignores the effects of the mailings in the charged counts. Two homeowners—the victims in Count 1 and Count 4 of the indictment—received in the mail payment schedules for their remaining fee balances and, consistent with those schedules, paid down the remainder of their fees. The fruition of the scheme—receiving the fee payment in full without actually saving the homeowners' homes or reducing their mortgage payments—was thus accomplished directly by use of the mails. *See United States v. Lane*, 474 U.S. 438, 452 (1986) (jury could find scheme was not completed until receipt of last payment, so mailings that took place while scheme was still continuing sufficiently supported mail fraud conviction); *McClellan*, 868 F.2d at 216 (mailing of invoice to ticket bureau, which in turn issued airline tickets, was necessary step in scheme to defraud).

The mailing to the third homeowner—Count 2 of the indictment—was slightly different: He also did not pay the full fee when he signed the agreement and he received a bill in the mail; but he finished paying in one lump sum rather than

follow the payment schedule. That payment still came *after* receiving the mailing, however, so a reasonable jury could find that the mailing contributed to the success of the scheme. *See Schmuck v. United States*, 489 U.S. 705, 711–12 (1989); *Lane*, 474 U.S. at 452.

Hernandez still contends that the fraud was complete upon the signing of the membership agreement, before the mailings. Even if the sign-up agreements were the heart of the scheme and the mailings merely secondary, mailings occurring after the fraudulent act are within the mail fraud statute if they assisted the defendant with avoiding detection. *See Lane*, 474 U.S. at 451–52; *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009). Here, the mailings contained payment receipts, a copy of the signed agreement that stated the Trust would purchase the homeowner's mortgage, and a refund policy. The mailings falsely indicated that the Trust would soon purchase the homeowner's mortgage and that if the Trust were unable to, it would refund the homeowner's fee. Because the mailings repeated the fraudulent promises and lent credibility to the legitimacy of the Trust, a reasonable jury could conclude that they helped Hernandez conceal the fraudulent scheme.

But, Hernandez insists, this court has said that "lulling" and "avoiding detection" are the same thing, and since the district court found no evidence of lulling, that necessarily means there was no evidence that the mailings helped her avoid detection. She relies on *United States v. O'Connor*, 874 F.2d 483, 486 (7th Cir. 1989), in which this court labeled as a "lulling" theory an argument that post-conduct communication furthered a fraudulent scheme by making detection less likely. But, here, the district court declined to give a "lulling"

instruction only because no victims testified that the mailing had a reassuring effect on them. Although it correctly stated the law, the district court properly rejected the instruction because the evidence did not support it. Here, the issue of lulling the victims was separate from the question of whether the mailings helped conceal the scheme after the fact. And the court concluded there was evidence that the mailings helped Hernandez forestall homeowners' inquiries and made detection of the scheme less likely. This was sound; a reasonable jury could infer that the mailings legitimized the scheme and therefore allowed it to continue longer.[1]

## B. Restitution Payment Schedule

Hernandez finally contends that the district court improperly delegated its authority to the Bureau of Prisons by failing to set a restitution payment schedule for the time she spent in prison. It is not clear why Hernandez raises this argument—the district court deferred mandatory payment until after her prison term ends, so payment in prison would occur only through the Bureau of Prison's voluntary Inmate Financial Responsibility Program. We have held that participation in that program cannot be made mandatory—indeed, it is plain error for a district court to order participation—even though the Bureau is permitted to impose penalties on prisoners who decline to participate. *See United States v. Miller*, 883 F.3d 998,

---

[1] Hernandez's narrow focus on the supplemental "avoid detection" instruction ignores that the jury was not instructed exclusively on this theory of "use of the mails." The court also gave the pattern jury instruction that the mails must have been used for the purpose of carrying out the scheme. Hernandez did not object to either instruction. And the preceding discussion explains why, as to each count, a mailing directly furthered the collection of fraudulent proceeds.

1005 (7th Cir. 2018); *United States v. Boyd*, 608 F.3d 331, 335 (7th Cir. 2010); 28 C.F.R. § 545.11(d). But deference to the Bureau with respect to the administration of the program is not impermissible delegation. *Boyd*, 608 F.3d at 335 (error mandating participation in program was not one of delegation because court did not have authority to order participation). If Hernandez has an issue with any payment plan established by the Bureau, her remedy is through the prison's grievance system. *See United States v. Sawyer*, 521 F.3d 792, 794 (7th Cir. 2008).

And, there is no impermissible delegation to the Probation Office or any other entity. A restitution order must be paid immediately unless the district court provides otherwise. *See* 18 U.S.C. § 3572(d)(1); *United States v. Wykoff*, 839 F.3d 581, 582 (7th Cir. 2016). In that case, the restitution order must include a schedule in which restitution is to be paid. *See* 18 U.S.C. § 3664(f)(2); *United States v. Moeser*, 758 F.3d 793, 800 (7th Cir. 2014). Here, the district court did provide otherwise—both orally at the sentencing hearing and in the judgment—by setting a schedule of payments (subject to Hernandez's income and expenses) commencing after Hernandez's release from prison. Thus, the district court did not err with the restitution schedule.

### III. Conclusion

We AFFIRM the district court's judgment.