In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-3477

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CRYSTAL LUNDBERG,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-CR-555-2 — **Elaine E. Bucklo**, *Judge.*

ARGUED FEBRUARY 24, 2021 — DECIDED MARCH 17, 2021

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Over the course of less than two years, Crystal Lundberg went on a $5.8-million spending spree. In that short time, she spent more than a half-million dollars at exclusive stores, such as Nieman Marcus, Nordstrom, Gucci, and Louis Vuitton, and $23,000 at Victoria's Secret. She incurred rental expenses exceeding $100,000 for a mansion in California. She bought a Jaguar automobile, diamonds, and Rolex watches. She paid for plastic surgery

and trips to places like Jamaica and Bora Bora. And she bought much, much more.

The problem? The money she spent wasn't hers. Nor was it Scott Kennedy's, the tormented boyfriend who gave her the credit card she used. No, the money and credit card belonged to Kennedy's employer, Nemera—intended for company purchases only.

Nemera eventually caught on, and the couple's scheme quickly unraveled. Kennedy cooperated with the government, pled guilty, and ultimately testified against Lundberg, who went to trial. The jury convicted Lundberg of five counts of wire fraud, and the court imposed a fifty-three-month sentence (plus well over $4 million in restitution).

Lundberg now appeals her conviction and sentence. Because we find no error in either, we affirm.

## I. BACKGROUND

Nemera is a French company that designs and manufactures medical and drug-delivery devices. Scott Kennedy was an accountant employed as the controller for Nemera's facility in Buffalo Grove, Illinois. In this position, Kennedy had near-complete control over the facility's finances, including its financial reporting, accounting, internal controls, budgeting, credit cards, and central banking account.

In 2012, Kennedy hired an escort named Crystal Lundberg through a website called Backpage (which has since been seized by the government for enabling prostitution). Evidently, Kennedy fell head over heels for Lundberg; he engaged her services several more times throughout the next few years, and they developed a romantic relationship.

In May 2015, Kennedy opened an American Express account on behalf of Nemera meant for company purchases from vendors. He had exclusive control over the card and was responsible for paying the bills from Nemera's account.

A couple months later, in July 2015, Lundberg asked Kennedy if she and her two daughters could move in with him. He readily agreed, paid off her hotel bill, bought her a car, and acquired a new apartment—then a five-bedroom house—to accommodate them all.

Kennedy expected their new living arrangement to be permanent, and because he was the sole source of income by this point, he promptly made efforts to stabilize their financial situation.

He spoke to Lundberg about his finances; asked her to sell some of her belongings to help cover expenses; requested that she put together a budget for things like her daughters' academic and extracurricular club fees; and suggested that she look into getting a job or government assistance. He also added Lundberg to his personal credit cards (but capped her spending at $1,500 per month, which apparently wasn't enough for Lundberg, who opened a few additional credit lines for small amounts using Kennedy's information without his knowledge).

Despite these efforts, Kennedy's debt burden ballooned—and fast. By October 2015, his personal credit cards were all maxed out and his finances were in shambles.

The next month, Lundberg asked Kennedy for help with a "big Christmas" for her kids. Kennedy replied that he was "broke" and had "nothing more to give." Lundberg suggested that they use the Nemera corporate card. Kennedy

objected at first—"Absolutely not. Can't do it."—and explained that the card was a business card for business use.

But he relented within a few days and handed over the Nemera card because he was "trying to be a provider for [the] family" and "make [Lundberg] happy." He reiterated to Lundberg that he did not have the money to cover the expenses and would have to use Nemera's funds. He also bought into Lundberg's tale that she would gain access to a trust account set up by her adoptive father when she turned thirty, and that that money could be used to pay back Nemera. (No such account existed.)

From that point on, Kennedy and Lundberg made thousands of personal purchases on the Nemera card. The credit-card bills exploded, and when they repeatedly hit their $125,000 limit, Lundberg would ask that Kennedy pay down the card. He always did, using Nemera's bank account.

His own involvement notwithstanding, Kennedy made tepid efforts to stop or slow Lundberg's spending. For example, in February 2016, he emailed Lundberg a detailed accounting of his earnings and the mounting bills to show her that they were living beyond their means. And after Lundberg made one $4,000 purchase at Louis Vuitton on the Nemera card, Kennedy told her: "Crystal, please don't buy anymore [sic]. We can't afford it, and we really don't need it."

By June 2016, the spending had taken a toll on Kennedy, who checked himself into a hospital for mental health treatment. He also wrote Lundberg an email:

> I feel like I'm not being heard or believed, just used … . I have crossed my moral and ethical boundary by allowing you to spend on my

> corporate Amex and using company funds to pay
> the balances. This should have never happened. I
> have put myself out on a limb to provide all that you
> want at the risk of jail, my livelihood, and my sanity.

But to no effect; Lundberg thereafter used the card to move herself out to San Diego, California, prepare to open her own spa, and lease a 7,000 square-foot home. (She was approved for the lease only after providing the leasing company with doctored versions of Kennedy's tax forms that appeared to reflect her personal income.)

Even while pleading with Lundberg to stop spending, however, Kennedy continued taking no small part in it himself. For example, he took a trip to Hawaii with Lundberg in July 2016 (on the corporate card), and when American Express's fraud-detection system blocked an attempted purchase (with the corporate card) at a jewelry kiosk, Kennedy—Lundberg at his side—called American Express to authorize the purchase.

During a trip to Miami (on the corporate card) for Lundberg to receive plastic surgery (on the corporate card), Lundberg told Kennedy that she did not want to go to jail. Kennedy rejoined that they could stagger their sentences so someone could remain at home with the kids.

In October 2016, Kennedy wrote another email to Lundberg, but he sent it to himself first so he could edit it. The email he sent to himself read:

> Am I just a bank account? You live in a mansion in
> California, constantly buying new gadgets, while I
> live in a hotel. All this spending is putting my career,
> my livelihood and my freedom at risk. I am commit-
> ting fraud and theft by allowing you to continue to

> spend and live your dream, and what do I get in re-
> turn?

Kennedy later testified that he sent a substantively identical email to Lundberg but deleted it after Lundberg responded through a series of text messages: "Omg please delete that email"; "Admitting your [sic] committing fraud"; "Delete that are you fucking crazy."

All the while, Kennedy diligently worked to conceal the fraud from his employer. He fabricated and altered Nemera's financial records to reflect that purchases made on the card were for legitimate business purposes. He even doctored select records that were to be reviewed by Nemera's external auditor. But by January 2017, Kennedy texted Lundberg, "We need to be careful in spending now. I have run out of hiding spots in the financials." Lundberg's reply: "Sorry."

And *still* Kennedy enabled Lundberg's spending, even flying out to California to assist her with the purchase of a $40,000 Rolex watch for her birthday.

Ultimately, the personal charges made on the Nemera card from late 2015 to early 2017 included, among other things:

- Trips to Texas, Disney World, Hawaii, Jamaica, Miami, and Bora Bora;

- $159,805 worth of products from Nieman Marcus;

- $138,640 worth of products from Nordstrom;

- $55,364 worth of products from Louis Vuitton;

- $25,572 worth of products from Gucci;

- $22,989 worth of products from Victoria's Secret;

- $85,150 worth of products from the House of Diamonds;

- $6,376 worth of products from Christian Louboutin;

- $103,398 in rent for a 7,000 square-foot home for Lundberg in California;

- $10,000 worth of NBA tickets;

- $31,000 to a plastic-surgery center;

- $61,000 on two Rolex watches;

- $12,000 for a piano;

- $40,000 for a Jaguar automobile;

- $55,617 for "pet care."

The scheme came to a swift end in March 2017, when American Express contacted Nemera about suspected fraud. Nemera suspended, and then terminated, Kennedy.

When Kennedy told Lundberg the jig was up, she barraged Kennedy with texts: "I am going to have to start selling myself again"; "I was so close"; "To being financially free"; "And you miss using [sic] your corp card scares the fuck out of me"; "They could come and take everything that was ever bought on that card." She was concerned that she'd go to jail: "Do I create a will for my kids in case I'm taken from them[?]"

In August 2017, a grand jury indicted Kennedy and Lundberg on six counts of wire fraud under 18 U.S.C. § 1343 and alleged that they jointly participated in a scheme to defraud Nemera by using the corporate card for personal expenditures. Kennedy cooperated with the government and entered a plea agreement. Lundberg went to trial.

At trial, Kennedy testified about the above details of the scheme. Other government witnesses included a Nemera executive, a part-time babysitter for Lundberg's children in California (who was also told the bogus story about Lundberg's trust account), and a forensic analyst who testified that the couple had spent $5,796,056 on personal expenditures from July 2015 to March 2017.

The defense called one witness—Kennedy—before resting its case. It never moved for a judgment of acquittal.

The jury found Lundberg guilty of five counts of wire fraud. At sentencing, the district court imposed a below-guidelines sentence of fifty-three months' imprisonment, plus restitution to Nemera ($3,390,000) and its insurer ($1 million). Lundberg appealed.

## II. ANALYSIS

Lundberg argues that (1) the district court erred by admitting three pieces of evidence, (2) there was insufficient evidence to support the jury's verdict, and (3) the district court erred at sentencing by applying the "sophisticated means enhancement" under U.S.S.G. § 2B1.1(b)(10)(C). We address these arguments in turn.

### A. Evidentiary Arguments

Lundberg argues that, under some combination of Federal Rules of Evidence 402, 403, and 404, the district court erred by allowing the government to introduce three pieces of evidence at trial: first, Lundberg's background as an escort; second, the October 2016 email that Kennedy wrote to himself in which he admitted that he was "committing fraud and theft"; and third, Lundberg's unauthorized opening of personal credit lines in Kennedy's name.

We usually review such evidentiary decisions for abuse of discretion, "[b]ut when a defendant fails to object to a potential evidentiary error … in the district court," they are forfeited and "reviewed only for plain error." *United States v. Thomas*, 933 F.3d 685, 690 (7th Cir. 2019) (citing *United States v. Ambrose*, 668 F.3d 943, 963 (7th Cir. 2012)). "On plain-error review, we may reverse if: (1) an error occurred, (2) the error was plain, (3) it affected the defendant's substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the proceedings." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 732–38 (1993); *United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019)).

An evidentiary argument can also be waived, which "extinguishes any error and precludes appellate review." *United States v. Clark*, 535 F.3d 571, 577 (7th Cir. 2008). While "forfeiture occurs when a party fails to make an argument because of accident or neglect," *Sansone v. Brennan*, 917 F.3d 975, 983 (7th Cir. 2019), waiver is "a deliberate decision not to present a ground for relief that might be available in the law," *United States v. Cook*, 406 F.3d 485, 487 (7th Cir. 2005).

Although Lundberg's counsel requested at oral argument that we apply plain-error review to her waived arguments as well as to her forfeited arguments, that request misunderstands the preclusive nature of waiver. Granting it would thus undo all the progress we've recently made in clarifying the difference between waiver and forfeiture. *See Ricci v. Salzman*, 976 F.3d 768, 771 n.2 (7th Cir. 2020); *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) ("In the criminal context, the distinction between waiver and forfeiture is critical: while waiver precludes review, forfeiture permits a court to correct an error under a plain error standard."). We therefore will not review

the arguments that we find waived and will apply plain-error review to those we find forfeited.

With respect to Lundberg's background as an escort—the defense not only failed to object to this information at trial, but it asked Kennedy on the stand if he had met Lundberg "on Backpage as an escort" and if Kennedy knew what Lundberg "does for a living."

Then, in closing argument, defense counsel sought to contrast Kennedy's background with Lundberg's. Referring to Kennedy—"Now, again, this is not some prostitute who doesn't have any education. This is Scott Kennedy. Scott Kennedy wasn't just an accountant, he's a CPA" (certified public accountant).

So even if there was an error, "[i]t is well settled that the defendant's reference to or use of a claimed erroneously admitted line of evidence waives the error." *United States v. Wolff*, 409 F.2d 413, 416 (7th Cir. 1969); *see United States v. Cooper*, 243 F.3d 411, 416 (7th Cir. 2001) (holding that a defendant waives an evidentiary objection when he refers to that evidence at trial).

Regarding the email that Kennedy sent himself— Lundberg waived this argument, too, because not only did she fail to object at trial, but she affirmatively stipulated to the email's admission. It's difficult to think of a clearer case of waiver. *See United States v. Schalk*, 515 F.3d 768, 774 (7th Cir. 2008) ("[B]ecause [the defendant] affirmatively stated at trial that he had no objection to [the evidence], any potential argument … is waived."); *United States v. Redditt*, 381 F.3d 597, 602 (7th Cir. 2004) ("When trial counsel affirmatively represents

that he has no objection to the admission of certain evidence, he has intentionally waived any argument to the contrary.").

And as to the testimony about Lundberg's unauthorized opening of additional credit lines—Lundberg failed to object to this evidence at trial, so the argument is forfeited. *See United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006) (noting that a failure to object to evidence at trial results in forfeiture). Lundberg concedes that plain-error review therefore applies but makes no effort to satisfy it. She makes only passing reference to Rules 403 and 404 but cites no cases or other authority supporting that the admission of this evidence was plain error that somehow affected her substantial rights or seriously affected the fairness, integrity, or public reputation of the proceedings. *Thomas*, 933 F.3d at 690. Plain-error review is a difficult obstacle to overcome even with a developed argument. It's impossible to overcome without one.

*B. Sufficiency of the Evidence*

We may overturn a jury verdict for insufficient evidence only "if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). This is a "nearly insurmountable" hurdle even when the argument is preserved. *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 405 (7th Cir. 2020) (quoting *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018)). The hurdle is even higher where a defendant fails to move for judgment of acquittal, in which case we again review for plain error. *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012) (citing *United States v. Irby*, 558 F.3d 651, 653 (7th Cir. 2009)).

We review for plain error here because Lundberg did not move for a judgment of acquittal. The "requirements for plain

error are met with respect to sufficiency of the evidence claims 'if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'" *United States v. Meadows*, 91 F.3d 851, 855 (7th Cir. 1996) (quoting *United States v. Wright*, 63 F.3d 1067, 1072 (11th Cir. 1995)); *see Sheneman*, 682 F.3d at 628 ("Under the plain error standard, [the defendant] must show that 'a manifest miscarriage of justice will occur if his conviction is not reversed.'" (quoting *United States v. Powell*, 576 F.3d 482, 491–92 (7th Cir. 2009))). Lundberg doesn't come close to satisfying this standard.

Lundberg argues that the evidence at trial did not support a finding that she was a knowing participant in the scheme to defraud Nemera; simply *knowing* about Kennedy's fraud, she maintains, is insufficient. Her overall contention seems to be that while she may have been all too happy to receive the fruits of *Kennedy's* fraud, she cannot be liable for it as a participant.

Lundberg is right that the specific intent to defraud is one element of wire fraud under 18 U.S.C. § 1343, *United States v. O'Connor*, 656 F.3d 630, 644 (7th Cir. 2011), and the intent to defraud "requires more than knowledge of 'shadowy dealings,' superficial participation, or the exchange of money," *id.* at 645 (quoting *United States v. Bailey*, 859 F.2d 1265, 1274 (7th Cir. 1988)). Rather,

> [t]o prove an intent to defraud, "we require a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." "Direct evidence of an intent to defraud is rare," however, and we have held that the

> Government may prove a specific intent to defraud through "circumstantial evidence and inferences drawn from the scheme itself that show that the scheme was reasonably calculated to deceive individuals of ordinary prudence and comprehension."

*United States v. Roberts*, 534 F.3d 560, 571 (7th Cir. 2008) (citations omitted) (quoting *United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007)). So "the government could not simply show that [Lundberg] participated in a transaction that turned out to be part of a fraudulent scheme. The government also had to show [Lundberg's] 'willful participation in the scheme with knowledge of its fraudulent nature and with intent that … illicit objectives be achieved.'" *Bailey*, 859 F.2d at 1273 (alteration omitted) (quoting *United States v. Price*, 623 F.2d 587, 591 (9th Cir. 1980)); *see also United States v. Johnson*, 927 F.2d 999, 1004 (7th Cir. 1991) (finding sufficient evidence of fraudulent intent where the defendant "knew of the deliberate falsification of … records and the subsequent receipt of federal funds," "observed and participated" in the scheme, and "knew the scheme was illegal").

The jury here was provided with ample evidence to support its finding that Lundberg had a "specific intent to deceive and cheat," *Sloan*, 492 F.3d at 891, because it showed that Lundberg knew she and Kennedy were spending money that was not theirs and that they were not authorized to spend, and that she directly participated in that illicit spending.

That's clear enough from our recap of the facts above. But to reiterate: Testimony established that Lundberg was first made aware of Kennedy's "broke" financial situation in November 2015, and in response, Lundberg proposed using the Nemera corporate card to buy Christmas gifts. Kennedy

testified that he initially refused and told Lundberg that the card was for company purchases only. Then he relented, and a corporate card was in Lundberg's possession for most of the next fifteen months. During that time, Lundberg and Kennedy made purchase after extravagant purchase to the tune of $5.8 million, far more than what Kennedy could have afforded on his own.

Trial evidence also supported that Lundberg knew all this spending was illicit. How could she not? Kennedy told Lundberg in June 2016 that he had "crossed [his] moral and ethical boundary by allowing [her] to spend on [his] corporate Amex and using company funds to pay the balances." This risked "jail," not to mention Kennedy's "livelihood" and "sanity." But Lundberg continued shopping. Four months later, Kennedy wrote that the "fraud" was weighing on him. Lundberg chided him to delete the email—then continued shopping. In December 2016, PayPal froze Lundberg's account (paid for with Nemera's card) due to suspicious activity. She and Kennedy drafted a fraudulent response to explain away the purchases—and then she continued shopping. The next month, Kennedy told Lundberg to be careful with spending because he had "run out of hiding spots in the financials." Lundberg responded "Sorry"—then continued shopping.

That evidence is sufficient to support the jury's finding that Lundberg had the requisite intent to defraud.

Lundberg's other arguments are equally unpersuasive. She argues, for example, that she could not have defrauded Nemera because she didn't work there and had no interactions with the company. That's not how it works. It is enough to show that Lundberg "was a knowing participant in the scheme" to defraud the company. *United States v. Jackson*, 546

F.3d 801, 815 (7th Cir. 2008). Lundberg also argues that she, unlike Kennedy, was uneducated and unsophisticated. But our cases "do not supply an unsophisticated defendant with an automatic defense to a fraud or conspiracy indictment." *Johnson*, 927 F.2d at 1005. "This principle is particularly applicable here. The government offered ample evidence of [Lundberg's] guilt. Accepting her exculpatory theory would require us to read the evidence in her favor rather than in favor of the jury's verdict." *O'Connor*, 656 F.3d at 645.

Lundberg's other scattershot attempts to undermine her conviction are likewise without merit.[1] The evidence was sufficient to establish that Lundberg was an active and knowing participant in the scheme to defraud Nemera and therefore supports the jury's verdict.

*C. Sophisticated Means Enhancement*

We turn last to Lundberg's challenge to the district court's application of the "sophisticated means" sentencing enhancement under U.S.S.G. § 2B1.1(b)(10)(C). The district court's application of this enhancement is "reviewed by this Court for clear error." *United States v. Friend*, 104 F.3d 127, 129 (7th Cir.

---

[1] For example, Lundberg argues that the jury's acquittal on Count 1 of the indictment "brings into question the validity" of the guilty verdicts on Counts 2 through 6 because the overall scheme was alleged in Count 1 (and incorporated by reference into the remaining counts). That argument is as undeveloped as it is frivolous. *See United States v. Pisman*, 443 F.3d 912, 914 (7th Cir. 2006) ("[T]he inconsistency in jury verdicts is not a basis for reversal except in the situation in which two guilty verdicts cannot co-exist." (citing *United States v. Powell*, 469 U.S. 57, 68–69 (1984))).

1997) (citing *United States v. Hammes*, 3 F.3d 1081, 1083 (7th Cir. 1993)). "Under this standard of review, we accord 'great deference' to the district court's finding and reverse it only if a review of the record demonstrates a 'definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Hickok*, 77 F.3d 992, 1007 (7th Cir. 1996)).

Under U.S.S.G. § 2B1.1(b)(10)(C), a defendant's offense level should be increased by two if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." An application note provides that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 cmt. n.9(B).

We have held that "the level of planning or concealment in relation to typical fraud of its kind is determinative." *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015) (citing *United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012)). So "[t]he sophisticated means enhancement does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual [fraud] case." *United States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006) (citing, among other cases, *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001)); *see United States v. Bickart*, 825 F.3d 832, 837–38 (7th Cir. 2016) ("'[S]ophistication' refers 'to the presence of efforts at concealment that go beyond (not necessarily far beyond, for it is only a two-level enhancement …) the concealment inherent in [the] fraud.'" (quoting *Kontny*, 238 F.3d at 821)).

The district court added two points to Lundberg's offense level under this enhancement because Lundberg altered Kennedy's tax forms and pay stubs so that they appeared to

reflect her own income and used those doctored documents to support her lease application for the 7,000 square-foot California home paid for with Nemera funds.

We find no clear error in the district court's application of the sophisticated means enhancement here. The doctoring of another person's tax forms to support a lease application for a home paid for with the victim's money obviously goes above and beyond the activity inherent in wire fraud, which requires only that the defendant "(1) participated in a scheme to defraud; (2) had the intent to defraud; and (3) used the wires in furtherance of the fraudulent scheme." *O'Connor*, 656 F.3d at 644. Count 3 of the indictment—the "transfer of approximately $12,422 in funds from American Express to Cal-Prop Management in San Diego, California, to pay the lease on [Lundberg's] San Diego residence"—plainly "involved" Lundberg's doctoring of Kennedy's tax forms, for without those falsified documents, Lundberg would not have been approved for the lease. And we have held that using "elaborate tactics to conceal the source of … money," *Ghaddar*, 678 F.3d at 603, falsifying payment stubs, *Kontny*, 238 F.3d at 820, and fabricating tax forms, *Bickart*, 825 F.3d at 838, each constitutes sophisticated means. Lundberg did all the above.

### III. CONCLUSION

Lundberg waived or forfeited her evidentiary arguments on appeal, the evidence was sufficient to support the jury's verdict, and the district court committed no clear error at sentencing. We therefore AFFIRM.