In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2679

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MELVIN BELL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00949-1 — **Virginia M. Kendall**, *Judge.*

ARGUED OCTOBER 27, 2021 — DECIDED MARCH 11, 2022

Before MANION, WOOD, and BRENNAN, *Circuit Judges.*

MANION, *Circuit Judge.* Melvin Bell and co-defendants, Monica Hernandez and Carlos Rayas, fraudulently promised victims that they could save their homes from foreclosure or lower their mortgage payments. To carry out this scheme, they invented Washington National Trust (WNT), which they marketed as a legitimate financial institution bankrolled by

wealthy Native Americans. Bell was the Director of Trust Operations, while his associates acted in subordinate positions.[1]

They targeted Hispanic homeowners, mostly monolingual Spanish-speakers, who were struggling to pay their mortgages or were already in foreclosure proceedings. Hernandez and Rayas falsely represented to victims that WNT would buy their mortgages and prevent their pending foreclosures in exchange for a membership fee, generally between $5,000 and $10,000.

On joining WNT, homeowners signed membership forms and agreements, and paid some or all the required fees. WNT then mailed these documents to the members or made them available for pick up, along with a welcome letter signed by Bell. After receiving a membership packet, usually by mail, if the member could not pay the full fee at the time of sign-up, he or she had to make installment payments. Homeowners also referred new members, from whom WNT sought and received additional fees.

In reality, WNT was not a licensed trust and never had the financial resources to buy out a single victim's mortgage. Instead, Bell and his associates spent the homeowner fees on personal expenses. WNT never once purchased a victim's mortgage or prevented a foreclosure. All told, over 60 homeowners joined WNT and lost almost $260,000.

In 2013, a federal grand jury indicted Bell, Hernandez, and Rayas under 18 U.S.C. § 1341 on four counts of mail fraud.

---

[1] Because Bell challenges the sufficiency of the evidence supporting the jury's verdict, we recount the evidence in the light most favorable to the prosecution. *See United States v. Hernandez*, 952 F.3d 856, 857 (7th Cir. 2020).

Bell consistently refused legal representation. Despite his objection, the district court assigned him an experienced defense attorney to act as stand-by counsel.

On the eve of trial, Bell moved to retain a recent law school graduate, attorney John Joyce. Since Bell had refused representation for 20 months despite being provided experienced stand-by counsel, the district court inquired about this development. In response to the district court's questioning, Joyce explained that he was newly admitted to the Illinois bar, had never tried a case, and had met Bell at the Metropolitan Correctional Center only a few days before. The district court advised Bell that choosing the inexperienced Joyce over the appointed stand-by counsel was a serious mistake. Undeterred, Bell insisted on Joyce.

The district court probed Joyce further about his relationship to Bell. Joyce informed the court that he had met with Bell at the behest of Rosa Eliades, co-defendant Rayas's counsel. Joyce told Bell during this visit that he was not his attorney. After the district court sought clarification, Joyce denied that Eliades asked him to visit Bell. (So too did Eliades in a later hearing.) The district court obtained conflict attorneys from the Federal Public Defender's Office to discuss this situation with Bell and Rayas separately, and later held a conflict hearing for Hernandez.[2]

The conflict counsel assigned to Bell advised him (1) about his right to conflict-free counsel, (2) of the conflict that could arise if Joyce represented him, (3) that waiving conflict-free counsel would preclude him from raising it during the trial or

---

[2] The district court determined in Hernandez's conflict hearing that Eliades had shared information about the case with Hernandez's counsel.

on appeal, and (4) of the dangers that choosing an inexperi-
enced attorney like Joyce could pose to him. After learning
about the potential conflict, Rayas and Hernandez chose new
attorneys. But Bell decided to stick with Joyce and thanked
the district court for its concern. He subsequently filed a writ-
ten, signed waiver in which he acknowledged his right to con-
flict-free counsel and the potential conflicts associated with
having Joyce represent him.

The district court proceeded to try Bell and Hernandez to-
gether. (Rayas pleaded out.) The government brought forth
witnesses to testify about their interactions with WNT person-
nel and presented correspondence sent from WNT to victims
bearing Bell's signature. In addition, the government submit-
ted into evidence a fraudulent $100,000 treasury check, which
someone had attempted to deposit into Bell's bank account,
to establish that WNT never had sufficient funds to purchase
mortgages. The jury found Bell guilty of three counts of mail
fraud, and the district court sentenced him to 150 months' im-
prisonment with a three-year term of supervised release to
follow and ordered him to pay $259,211 in restitution. Bell ap-
peals.

He first argues that the district court erred by allowing
him to proceed with Joyce, who he asserts provided ineffec-
tive assistance of counsel because of his relationship with
Rayas. Bell contends that the district court should have tried
harder to convince him to choose a different attorney or, fail-
ing that, just forced him to.

A defendant's Sixth Amendment right to effective assis-
tance can be violated when his counsel has a conflict of inter-
est, but the right to conflict-free counsel can be waived. *Free-
man v. Chandler*, 645 F.3d 863, 868 (7th Cir. 2011). Generally,

when there is no conflict of interest, the district court must respect the defendant's choice of counsel. *United States v. Turner*, 594 F.3d 946, 952 (7th Cir. 2010). On the other hand, the district court may decline to accept a waiver if there is "an actual conflict of interest that seriously undermines counsel's effectiveness" or a "serious potential" for such a conflict to arise. *Id.* at 948. On appeal, it is the defendant's burden to show that there was an actual or serious potential for conflict. *See United States v. Coscia*, 4 F.4th 454, 475 (7th Cir. 2021).

Generally, a defendant's waiver is valid when the judge informs him that he has a right to conflict-free counsel and ensures that he understands the potential consequences of the conflict. *Freeman*, 645 F.3d at 868. The district court need only be satisfied that the defendant made an informed decision—not that the decision was a prudent one. *United States v. Flores*, 5 F.3d 1070, 1078 (7th Cir. 1993).

Bell has not shown that there was an actual or potential conflict of interest that seriously undermined Joyce's effectiveness. Essentially, Bell contends that Joyce's relationship with Rayas might have affected Joyce's ability to represent him because Joyce would not have been able to use strategies that might have damaged Rayas's case, especially if Rayas had decided to work with the government against Bell. However, these asserted possibilities are mere conjecture and would apply to any case in which there is joint representation.[3] *See Turner*, 594 F.3d at 954. We have held that the mere possibility that one co-defendant might work against the

---

[3] The record indicates that Joyce had a relationship of some kind with Rayas, but it is not clear whether it rose to the level of formal representation. For purposes of this appeal, we need not resolve that issue.

other at trial is not sufficient to justify overriding the right of preferred counsel. *Id.* Bell does not provide any particularized assertions that Joyce subordinated his efforts in Bell's defense to those of Rayas. Generalized speculation does not require a court to invalidate a defendant's right to choose counsel.

Bell attempts to sidestep this analysis. He asserts that the district court should have rejected his waiver because Joyce's relationship with Rayas rose to the level of a "structural error." This refers to a rare kind of error that so undermines the fairness of a criminal proceeding that it triggers automatic reversal. *United States v. Davila*, 569 U.S. 597, 611 (2013). Bell cites no authority for the proposition that an actual or potential conflict of counsel can constitute a structural error. The caselaw holds to the contrary—structural error can occur when the district court does *not* allow a defendant to choose "counsel of [his] choice." *Id.* And holding that a conflict automatically gives rise to structural error would render insensible the mass of authority that allows defendants to waive conflict-free counsel. Simply put, we find no merit in this contention.

Regarding the validity of the waiver, the district court conscientiously ensured that Bell knew his rights and understood the possible pitfalls of choosing his preferred attorney. Not only did the court attempt to deter Bell from choosing Joyce rather than the experienced court-appointed stand-by counsel, it also procured a conflict attorney from the Federal Public Defender's Office to advise Bell about his rights and the possible consequences of choosing to waive them. Repeatedly and despite the district court's best efforts, Bell insisted on Joyce.

In sum, the record shows that Bell's waiver was knowing and voluntary, and he has not demonstrated an actual or serious potential for conflict that would have obliged the district court to disregard his waiver. Accordingly, Bell cannot now argue that Joyce's counsel was ineffective because of a conflict. *See Coscia*, 4 F.4th at 475.

Bell next contends that the district court erred by allowing the government to introduce as evidence a $100,000 fraudulent check that someone attempted to deposit into his bank account as the scheme was unravelling. He asserts that the fraudulent check was inadmissible propensity evidence. In other words, the government wanted to suggest to the jury that, because Bell passed fraudulent checks, he probably committed mail fraud too.

Although Federal Rule of Evidence 404 bars the introduction of evidence to show a person's propensity to act a certain way, this rule "does not apply to direct evidence of the crime charged." *United States v. Ferrell*, 816 F.3d 433, 443 (7th Cir. 2015). In the fraud context, evidence can be direct when admitted as proof of an overall scheme. *United States v. Lanas*, 324 F.3d 894, 901 (7th Cir. 2003). We review the district court's evidentiary rulings for abuse of discretion and will only reverse a ruling if there was no rational basis for it. *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010).

Here, the government introduced the fraudulent check to show that Bell and his co-defendant falsely represented to homeowners that WNT could purchase mortgages despite knowing that WNT did not have the resources to do so. This evidence countered Bell and Hernandez's argument that WNT was a legitimate financial entity. The district court found that the fraudulent check tended to show that Bell and

Hernandez were deceiving homeowners when they repre-
sented that WNT could purchase mortgages outright. Given
the evidence that the fraudulent check for $100,000 briefly ap-
peared in Bell's account around the time that he needed to
make good on WNT's many false representations, we cannot
say that the district court abused its discretion in admitting
the check as direct evidence of a scheme to defraud.

Bell also challenges the sufficiency of the evidence sup-
porting the verdict. Because he did not move for a judgment
of acquittal at the close of the government's case, we review
for plain error. *See United States v. Lundberg*, 990 F.3d 1087,
1095 (7th Cir. 2021). Under this standard, reversal is war-
ranted only "if the record is devoid of evidence pointing to
guilt." *Id.*

Bell offers two reasons why the evidence was insufficient
to support the verdict. He argues that the membership pack-
ets mailed to victims did not advance the scheme to defraud
and that the evidence didn't show that he knew about the
scheme or that it involved the use of the mails.

We essentially rejected Bell's first contention in co-defend-
ant Hernandez's appeal, *United States v. Hernandez*, 952 F.3d
856 (7th Cir. 2020). There, Hernandez also argued that the
scheme to defraud did not depend on the mailings. To the
contrary, we held that a reasonable jury could find that the
mailings contributed to the success of the scheme because cer-
tain victims submitted payments to WNT after receiving the
membership packets in the mail. *Id.* at 860. "Because the mail-
ings repeated the fraudulent promises and lent credibility to
the legitimacy of [WNT]," we determined that the jury could
reasonably "conclude that they helped Hernandez conceal the

fraudulent scheme." *Id.* This reasoning applies with equal force to Bell's case.

His second argument fares no better. Although his co-defendants were the ones who met with victims in person, the evidence showed that Bell controlled the scheme. A WNT employee testified that Bell was in charge of WNT, and the membership packets mailed to victims bore Bell's signature as Director of Trust Operations; a jury could conclude from this information that Bell could foresee the use of the mails to advance the scheme. Further, Bell used the homeowner fees on personal expenses and never once purchased a mortgage or prevented a foreclosure. Additionally, a fraudulent check for $100,000 was deposited into Bell's account, from which a jury could infer that he knew that WNT did not have the financial resources to carry out its purported mission. And, in response to state regulators informing him that he operated an unlicensed trust, he continued to recruit homeowners and collect fees. This record is hardly devoid of evidence pointing to guilt.

Finally, Bell contends that the district court erred by constructively amending the indictment via jury instructions. Constructive amendment occurs when a district court expands the possible bases of conviction beyond those charged by the grand jury. *United States v. Trennel*, 290 F.3d 881, 888 (7th Cir. 2002). But we need not get into the specifics of his contentions.

When defense counsel affirmatively approves proposed jury instructions, a defendant waives his right to challenge them on appeal. *United States v. Natale*, 719 F.3d 719, 730 (7th Cir. 2013). That's what happened here. The district court recited the instructions that it intended to give the jury

regarding the charge of mail fraud and asked defense counsel if he had any objection. Joyce responded, "No, we don't have a problem with that, your Honor." Assertions of this sort are enough to constitute waiver. *Id.* (collecting cases). Consequently, Bell cannot make this argument here.

Having reviewed the record and the arguments in the briefs, we AFFIRM the district court's judgment.