In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-1505

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSÉ ANTONIO MIRELES, JR.,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-CR-485(9) — **Virginia M. Kendall**, *Chief Judge.*

———————————

ARGUED MARCH 29, 2024 — DECIDED SEPTEMBER 12, 2024

———————————

Before ROVNER, ST. EVE, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* José Mireles participated in a drug distribution conspiracy that flooded Chicago with hundreds of kilograms of cocaine and heroin. Mireles's role was to retrieve drug shipments and deliver them to his boss's customers in exchange for duffle bags of cash. Mireles then helped launder those proceeds back to Los Angeles, where he and the drug network's ringleader lived.

Eventually, the Drug Enforcement Agency shut down the network in a sting that involved the simultaneous arrests of multiple coconspirators, including Mireles. While en route to the Los Angeles federal courthouse to be arraigned, Mireles escaped from DEA custody. He was apprehended again about 18 months later—this time for good—and proceeded to trial. Mireles was ultimately convicted and sentenced to 342 months' imprisonment.

Mireles now challenges his conviction by asserting that the court erred in admitting certain evidence. He also takes aim at his sentence, contending that the court procedurally erred and imposed a substantively unreasonable sentence. We affirm Mireles's conviction; the district judge ably handled this sprawling case and did not err in admitting the challenged evidence. Nevertheless, we order a limited remand for resentencing because we cannot discern the factual basis for one of the sentencing enhancements that Mireles received.

## I. BACKGROUND

We take the following account from the testimony and evidence introduced at trial.

### A. Factual Background

#### 1. *The Roque Distribution Network*

Mireles worked as a trusted member of Edgar Roque's cocaine distribution network, which employed up to 50 people. Through his network, Roque distributed more than 1,500 kilograms of cocaine and 100 kilograms of heroin in Chicago. *See United States v. Sanchez*, 989 F.3d 523, 532–34 (7th Cir. 2021) (describing Roque's drug distribution network and affirming his original sentence). After his conviction and sentencing,

Roque testified against Mireles in hopes of receiving a re-
duced sentence. Much of the evidence at Mireles's trial came
from Roque's testimony. We start by describing Roque's over-
arching drug scheme to situate Mireles's place within it.

Roque started as a small-time dealer out of his dad's auto-
body shop in Los Angeles in 2008. But two developments
proved extraordinarily lucrative. First, Roque developed a re-
lationship with the Sinaloa cartel, which provided Roque with
cocaine on credit. Second, Roque was able to bribe an Amtrak
Station manager in Los Angeles. In exchange for $500 per
shipment, the manager would ensure that Roque's packages
were shipped via Amtrak's train-based package delivery ser-
vice, Amtrak Express, without going through the normal
package screening procedures. These two developments were
significant because the selling price of cocaine was signifi-
cantly higher in Chicago than it was in Los Angeles and the
cartel was willing to provide as many drugs as Roque could
sell.

Roque's scheme was surprisingly simple. To send cocaine
from Los Angeles to Chicago, Roque would ship a package
using Amtrak Express. He would pack the cocaine in boxes
topped off with scrap auto parts, send the box from the
Amtrak station in Los Angeles and have someone pick it up
at Chicago's Union Station. Roque often had his workers fly
from Los Angeles to Chicago to retrieve, stash, and distribute
the drugs. From 2009 until 2015, Roque averaged about one
shipment per week, with each shipment containing 10 to 40
kilograms of cocaine. In about 2012, he began occasionally
supplementing his shipments with 10 kilograms of heroin.

These drugs sold for enormous sums—at a price of $33,000
per kilogram of cocaine and $40,000 per kilogram of heroin, a

single shipment could be worth more than $1 million. All the proceeds, of course, had to be laundered back to Los Angeles. Roque used various strategies to do so. He hired women to carry cash in luggage through the airport. He also filled cartel-connected semitrucks with pallets of cash and operated about 100 different bank accounts, which he managed by keeping detailed ledgers. He would have his workers, friends, and family open bank accounts, into which his workers would then deposit just under $10,000 in cash, which would then be withdrawn in Los Angeles. Anyone could deposit money into these accounts, but only the account holder could withdraw it. Once the drug proceeds were laundered back to Los Angeles, Roque would repay the cartel and take his cut.

By Roque's own estimate, he distributed 2,000 to 3,000 kilograms of cocaine, plus about 200 kilograms of heroin, which netted $60 to $70 million in proceeds.

### 2. *Mireles Joins the Enterprise*

In October 2013, one of Roque's Chicago stash houses was raided by law enforcement. Suspecting that his workers were compromised, Roque looked to recruit new, trusted employees.

Mireles was one such recruit. Roque and Mireles were high school acquaintances and had kept in touch over the years. Mireles knew that Roque was involved in dealing drugs but was not part of Roque's network.

Shortly after the October 2013 raid, Roque asked Mireles to accompany him to Chicago to help "pick up some gifts." Mireles agreed. Soon after, they traveled to Chicago together "for a week or two" and stayed in a downtown hotel. Once they arrived, one of Roque's workers met them at the hotel

with a "gift." Roque and Mireles then delivered it to one of Roque's customers, Donald Williams. Afterward, Roque and Mireles went out to lunch and Roque asked Mireles if he would retrieve these "gifts" on his own. Roque told Mireles that the boxes contained marijuana; both laughed incredulously.

Mireles agreed to retrieve one of Roque's gifts, so Roque arranged for one of his workers in Los Angeles to send a shipment of cocaine. The package arrived two days later in Chicago, and Mireles retrieved it from Union Station. Mireles then picked up Roque from their hotel and they again gave the drugs to Williams.

On the way back to the hotel, Mireles agreed to continue working for Roque. In exchange for Mireles's services, Roque agreed to pay Mireles $200 per kilogram that he retrieved and another $200 per kilogram that he delivered to Roque's customers. Because the box that they had just delivered to Williams contained 15 kilograms of cocaine, Roque agreed to pay Mireles $6,000 for retrieving and delivering that cocaine. Mireles agreed, and, with the arrangement secured, Roque and Mireles returned to Los Angeles.

### 3. Mireles's Trips to Chicago

Mireles made about 10 more trips from Los Angeles to Chicago to retrieve, stash, and distribute drugs. Mireles was regularly involved in retrieving packages at Chicago's Union Station, some of which were delivered in his name.[1] When

---

[1] Amtrak provides "waybills," essentially labels that double as receipts, for the packages it delivers. Because the person responsible for retrieving the package had to provide photo identification, the recipient had to provide their real name. The sender typically used an alias.

Mireles traveled alone to Chicago, Roque managed things from afar by texting and calling Mireles. Other times, Roque and Mireles would travel to Chicago together. For example, in February 2014, Roque and Mireles returned to Chicago for a month or two. During this trip, Roque received 20 to 30 drug shipments. Mireles picked up several of these packages from Union Station. He would then transport the drugs back to one of Roque's stash houses, unload the shipment, and assist in preparing it for delivery. Then when Roque's customers were ready, Roque would often have Mireles deliver the drugs, typically on credit, to Roque's customers.

When Roque's Chicago-based customers were ready to pay, Mireles would pick up the cash, often packed in duffle bags. Mireles's largest cash pick up during the February 2014 trip to Chicago was $1.8 million. He then helped send the cash back to Los Angeles. Up to 50 times during this trip alone, Mireles deposited between $9,000 and $9,500 into the various bank accounts that Roque controlled.

### 4.   *The Trip to Mexico*

In October 2014, one of Roque's semitruck drivers was stopped by law enforcement. The truck—which held $1.3 million in cash that belonged to the Sinaloa cartel—was seized. Roque reported the seizure to Jorge Cazeras, Roque's high-ranking contact with the cartel. Cazeras instructed Roque to come to Mexico and bring the driver, who went by Batecas, for questioning.[2]

---

[2] It seems that this was the typical procedure when the cartel suffered significant losses. If they could verify that the money had been seized by law enforcement, and no one was at fault, that was deemed a cost of doing business. The alternative was grim.

Roque agreed and decided to bring Mireles too. Mireles had nothing to do with the seized cash, but Roque decided to bring Mireles anyway. Roque would often bring his workers with him to Mexico to impress upon them the danger of double-crossing him.

Roque, Mireles, and Batecas drove from Los Angeles to a gas station in Mexicali, Mexico. Cazeras, several other cartel members, and three vehicles were waiting. Roque, Mireles, and Batecas all got in one of the cars while Cazeras rode in another. Over the next hour, one of Cazeras's henchmen grilled Batecas about the lost cash and admonished him to tell the truth to Cazeras when they arrived.

After about an hour, the caravan arrived at a small ranch at the end of a dusty dirt road. Cazeras brought Roque, Mireles, and Batecas around the side of the house where they encountered ten men, armed with assault rifles. Cazeras questioned Batecas about the lost money. Batecas explained that it was lost during a routine traffic stop, but Cazeras was unconvinced. Before long, Cazeras and his men beat a confession out of Batecas, who admitted that he had taken an unapproved cash-hauling job for another drug dealer, which was against cartel rules.

Roque convinced Cazeras not to "butcher" Batecas on the spot as it would be bad for business. Cazeras agreed, and then took Roque and Mireles out for lunch. When Roque and Mireles were permitted to leave three days later, Batecas remained as a hostage held for ransom.

### 5. *Mireles Returns to Chicago*

By November 6, 2014, Mireles was back in Chicago doing Roque's bidding. On that trip, one of Roque's other workers,

Angelica Cervantes, picked up 10 kilograms of heroin from Union Station. Cervantes thought that she was being followed by law enforcement and relayed word to Roque. Roque called Mireles and sent him to investigate. Within half-an-hour, Mireles found her vehicle and confirmed that she was being followed by undercover law enforcement. Mireles tried to create a diversion, but Cervantes was caught anyway.

### 6. *The Conspiracy Crashes*

In June 2015, Roque flew to Chicago to set up a new stash house. He picked a place in Streamwood, Illinois, and told one of his workers to stash 30 kilograms of cocaine at the house. Over a series of text messages, Roque directed Mireles to come to Chicago and help with an incoming drug shipment. Roque also requested that Mireles find a "Glock 19, Generation 4" handgun. Mireles agreed but was unsuccessful in locating the firearm.

On June 22, 2015, Mireles flew to Chicago and took a taxi to the Streamwood stash house. Mireles observed one of Roque's workers take 20 kilograms of cocaine from the stash house for delivery to a customer. When the worker got back to the stash house, he said that he thought he was being followed.

June 23 was pivotal. Roque and Mireles left the Streamwood address to replace their burner phones. Before they left, they stashed the remaining cocaine in the vents. They also hid about $90,000 in cash under the T.V. stand. Shortly after they left, though, law enforcement pulled them over and took them to the police station. Meanwhile, other officers obtained the consent of one of Roque's workers to search the Streamwood stash house and found the stashed cash. After some

interrogation, the officers released Roque and Mireles. The two went to a hotel to regroup.

Shaken, Roque and Mireles reconnected with a pair of Roque's workers. One of them began asking suspicious questions, which Roque took to mean that his entire network was compromised. So, Roque and Mireles made their way back to Los Angeles. Roque then fled to Mexico for several months; Mireles appears to have stayed in Los Angeles. As far as the record reveals, this was the end of Roque's cocaine empire and Mireles's role within it.

### 7. *Mireles's Arrest, Escape, and Re-Arrest*

In 2016, law enforcement obtained arrest warrants for Roque, Mireles, and about a dozen others. DEA Special Agent Nina Goteva and other law enforcement members were assigned to arrest Roque and Mireles in Los Angeles. On October 26, 2016, the officers—dressed in plain clothes with tactical vests marked "Police" on the back—arrested Roque without incident around 6:00am. They then drove in unmarked rental cars to Mireles's residence. Around 6:30am, the officers knocked on Mireles's door, announced themselves, and explained to Mireles that they had a warrant for his arrest (though they did not show it to him). The officers then placed Mireles under arrest and put him inside one of the rental cars for transportation to the courthouse for processing.

As they sat in traffic, Agent Goteva, who was in a different car than the one transporting Mireles, observed the door of Mireles's vehicle swing open. Mireles stumbled out of the back seat with his hands cuffed in front of him and began fleeing. Agent Goteva called out over the radio that Mireles was escaping and then began pursuing Mireles on foot.

Mireles ran across the median, through four southbound lanes of highway traffic, and down a steep embankment. Agent Goteva and another officer chased Mireles into a neighborhood where several construction workers were working. Agent Goteva momentarily lost sight of Mireles, but then heard screeching tires. She saw a white pickup truck speeding toward her with Mireles behind the wheel. Mireles drove straight toward her. Agent Goteva opened fire, but Mireles swerved off and made his getaway.

Mireles was ultimately apprehended about a year-and-a-half later by the U.S. Marshals. The Marshals were asked to locate Mireles in February 2018. On May 17, 2018, they staked out Mireles's residence in Los Angeles—the same one where Agent Goteva first arrested Mireles—to see if he was still living there. The Marshals had surveilled his residence "maybe twice" before. Mireles was there, sleeping in his bed. This time, Mireles was arrested without incident.

**B. Procedural Background**

For his role in the Roque drug distribution network, Mireles was charged by superseding indictment with Conspiracy to Possess with Intent to Distribute and Distribute Cocaine and Heroin. *See* 21 U.S.C. § 846; 18 U.S.C. § 2. All of Mireles's codefendants pled guilty, but Mireles elected to proceed to trial.

*1. Pretrial Motions*

Ahead of trial, the government moved *in limine* to admit two pieces of prior-bad-acts evidence under Federal Rule of Evidence 404(b). First, the government moved to introduce evidence that Mireles did not file tax returns while he was involved in the conspiracy. The government asserted that this

evidence showed that Mireles did not have a legitimate source of income despite having significant sums of money flowing through his bank accounts. Second, the government moved to introduce evidence of Mireles's pre-trial escape to prove his consciousness of guilt.

Mireles objected to both pieces of evidence. As for the tax-return evidence, Mireles asserted that this evidence was conjectural because many people fail to file tax returns. Concerning the evidence of his escape, Mireles argued that this evidence was unfairly prejudicial and lacked probative value, arguing that he believed he was again being kidnapped by the cartel. He argued his prior experience with Batecas and his inability to see the agents' marked vests made this belief reasonable.

The court ruled that both pieces of evidence were admissible. In the court's view, the tax-return evidence was admissible to show "consciousness of potential guilt" that this was money that Mireles knew he could not put on a tax return. The court concluded that any prejudice could be dealt with through cross examination. In regard to the flight evidence, the court also found that it was admissible to show consciousness of guilt but barred any reference to the fact that Agent Goteva shot at Mireles as he was fleeing.

The government also made a *Santiago* proffer[3] to admit the June 2015 text message conversation between Mireles and

---

[3] In *United States v. Santiago*, we approved a pretrial procedure whereby a district judge can decide to admit coconspirator testimony based on the government's proffer that it has sufficient evidence to prove the existence of a conspiracy by a preponderance of the evidence at trial. 582 F.2d 1128, 1130–31 (7th Cir. 1978) (overruled on other grounds by *Bourjaily v. United*

Roque concerning the purchase of a firearm. The government argued that these out-of-court statements helped establish Mireles's active participation in the drug conspiracy and not that of a simple bystander. Mireles responded that "we don't have an objection to what [the government] propose[s] to use regarding coconspirator statements if" the court makes "the initial finding that they are, in fact, coconspirators." The district court responded that it would "accept the proffer that shows that a conspiracy existed, that the defendants identified within this proffer were members of that conspiracy, and that the statements identified in the proffer were in furtherance" of the conspiracy. The court confirmed that Mireles could object "if something doesn't fit within any one of those parameters." But Mireles never made or renewed any such objection at trial.

    2.  *Trial*

Prior to Mireles's trial, Roque had pled guilty and been sentenced to 420 months' imprisonment for his role in the conspiracy. *See Sanchez*, 989 F.3d at 533–34. Hoping to receive a reduced sentence, Roque testified for the government at Mireles's trial.

To rebut Roque's credibility problems, the government relied on other members who participated in the drug scheme and corroborating evidence. For example, the government called Donald Williams, who testified about Mireles's

---

*States*, 483 U.S. 171 (1987)). "This procedure helps streamline trials by permitting the government to introduce co-conspirator testimony at any point during the trial rather than waiting until after it has provided sufficient independent proof of conspiracy." *United States v. Bey*, 725 F.3d 643, 647 (7th Cir. 2013).

personal involvement in packaging and delivering drugs as well as picking up cash payments. The government also provided substantial documentary evidence, including Amtrak receipts, flight records, phone records, bank records, text messages, and recorded calls of Mireles. The government also relied on numerous law enforcement officers who testified at the trial and corroborated these records. In short, this evidence supported Roque's account of Mireles's travels, package retrievals, money laundering, and knowing participation in a drug conspiracy.

At the close of trial, the jury rendered a unanimous verdict of guilty.

### 3. *Sentencing*

After Mireles's conviction, the United States Probation Office prepared a Presentence Investigation Report. The PSR concluded that Mireles's base offense level was 36, driven primarily by the drug quantity attributable to Mireles from the conspiracy. *See* U.S.S.G. § 2D1.1(c) (2018). To the base offense level, the PSR added a two-level enhancement related to Mireles's escape: one for obstructing justice, *id.* § 3C1.1, and the other for recklessly creating a substantial risk of death or bodily injury, *id.* § 3C1.2. With a criminal history category of II, Mireles's total offense level of 40 yielded an advisory guidelines range of 324 to 405 months' imprisonment.

At sentencing, Mireles objected to the PSR's drug quantity calculation and the sentencing enhancements. As for the amount of drugs attributable to him from the conspiracy, Mireles argued that he could only be held responsible for the drugs that he personally retrieved from Union Station. In response, the government proposed a more conservative figure

of 140 kilograms of cocaine and 10 kilograms of heroin, which was the minimum amount received while Mireles was in Chicago. This figure did not, however, alter Mireles's base offense level calculated by the probation office. The district court concluded that the government's more conservative figure was the appropriate measure of Mireles's responsibility.

The parties next debated simultaneously the propriety of applying both the obstruction-of-justice enhancement and the reckless-endangerment enhancement based on Mireles's escape. Mireles maintained that he thought he was being kidnapped by the cartel, and not being arrested by law enforcement, so he did not knowingly obstruct justice. The government maintained that Mireles's argument was "ridiculous" because the agents wore police vests, handcuffed Mireles, and drove north toward downtown, not south toward Mexico. Mireles retorted that if he was trying to obstruct justice, as found in the PSR, he would have gone into hiding, not home.

After hearing argument, the court applied both enhancements. The court found that Mireles "was aware of the indictment such that when the agents came to arrest him, he knew that he was being arrested" for his role in the drug conspiracy. The court also noted that Mireles had driven "towards Agent Goteva to harm her or take her out." This "was a threat to her such that she had to discharge her firearm." Accordingly, the court imposed "both levels for the specific offense characteristics of obstruction, one for the action against the agent, and one for his evading the administration of justice … for avoiding that indictment." Applying these enhancements, the district court calculated the same ranges as the PSR and found Mireles's offense level yielded an advisory guideline range of 324 to 405 months' imprisonment. After considering the

parties' arguments about an appropriate sentence based on the 18 U.S.C. § 3553(a) factors, the court imposed a within-guidelines sentence of 342 months' imprisonment.

Mireles timely appealed.

## II.    ANALYSIS

### A.  Mireles's Evidentiary Challenges

Mireles first challenges the district court's admission of three pieces of evidence, including: (1) evidence that he failed to file tax returns during the conspiracy, (2) evidence that he fled law enforcement, and (3) evidence of his phone call with Roque in which he agreed to procure handguns. We address these challenges in turn.

A district court's evidentiary rulings, including its decision of whether to admit evidence of other bad acts, is reviewed for an abuse of discretion. *United States v. Edwards*, 26 F.4th 449, 453 (7th Cir. 2022). "Under this standard, we will defer to the district court unless no reasonable person could adopt its view." *United States v. Schmitt*, 770 F.3d 524, 532 (7th Cir. 2014). Even if we find the district court improperly admitted certain evidence, we will only reverse if the error was harmful, meaning that "the 'average juror would find the prosecution's case significantly less persuasive without the improper evidence.'" *Id.* (quoting *United States v. Garcia-Avila*, 737 F.3d 484, 490 (7th Cir. 2013)).

Unpreserved challenges are treated differently. When the government moves to introduce certain evidence and the defendant deliberately does not object, any challenge to the admission of that evidence is waived. *See United States v. Lundberg*, 990 F.3d 1087, 1094 (7th Cir. 2021); *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020). On the other hand, if the

defendant fails to object by accident or out of neglect, our review is for plain error. *Lundberg*, 990 F.3d at 1094.

### 1.  Admission of Mireles's Failure to File Tax Returns

Over Mireles's objection, the district court admitted evidence at trial that Mireles did not file tax returns in 2013, 2014, or 2015—i.e., while he was participating in the conspiracy. In the court's view, this evidence, when combined with evidence that Mireles's bank accounts had about $100,000 flowing through them during the conspiracy, was admissible to demonstrate Mireles's knowledge that he was participating in a drug conspiracy and the funds were the ill-gotten gains of the drug sales. On appeal, Mireles maintains that this evidence was improperly admitted pursuant to Rule 404(b) of the Federal Rules of Evidence.

For the most part, "[r]elevant evidence is admissible," whereas "[i]rrelevant evidence is not." FED. R. EVID. 402; *see United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014) (en banc) (detailing at length the admissibility of other-act evidence). But not *all* relevant evidence is admissible. *Schmitt*, 770 F.3d at 532–33. Federal Rule of Evidence "404(b)(1) bars evidence of uncharged misdeeds to prove that the defendant had a propensity for committing crime." *United States v. Brewer*, 915 F.3d 408, 415 (7th Cir. 2019). Yet, Rule 404(b)(2) permits the introduction of such evidence if it is being used for other purposes, including "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b).

The key question when tasked with deciding whether Rule 404(b) applies is how the evidence of the defendant's other bad acts is being used. This is done by the district court

establishing through a "propensity-free chain of reasoning" that the other-act evidence is relevant to a specific issue in the case, and that the probative value of this evidence is not substantially outweighed by its prejudicial effect. *Schmitt*, 770 F.3d at 532–33 (citing *Gomez*, 763 F.3d at 852, 856).

In *Gomez*, we provided district courts with a "roadmap" for how to deal with Rule 404(b) evidence. *United States v. Brewer*, 915 F.3d 408, 415 (7th Cir. 2019) (citing *Gomez*, 763 F.3d at 860). After a Rule 404(b) objection, the government must show that the other-act evidence is "relevant to a legitimate purpose" that does not depend on "the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case." *Id.* (quoting *Gomez*, 763 F.3d at 860). If the government can prove a legitimate, non-propensity use for this evidence, then the district court must "assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice" under Rule 403. *United States v. Mabie*, 862 F.3d 624, 633 (7th Cir. 2017) (citation omitted). Because of the inherent risk of unfair prejudice arising from evidence of prior bad acts, the district court may exclude the other-acts evidence if the risk is too great. *Id.*; *see also Gomez*, 763 F.3d at 857 ("Other-act evidence raises special concerns about unfair prejudice because it almost always carries some risk that the jury will draw the forbidden propensity inference.").

Following the path we outlined in *Gomez*, the district court properly admitted evidence of Mireles's failure to file tax returns during the time of the drug conspiracy. After Mireles raised his Rule 404(b) objection to the government's request to introduce evidence of Mireles's substantial income during the taxable years of 2013, 2014, and 2015 and his failure to file

income tax returns for these years, the government argued that this other-act evidence was relevant to prove Mireles's knowing participation in the drug conspiracy, which, was an issue at trial. The "propensity-free" chain of reasoning showing that this evidence was relevant to Mireles's knowing participation stems from the fact Mireles had approximately $100,000 flowing through his personal bank accounts—funds that he withdrew but did not necessarily deposit. Despite having these significant funds, Mireles did not file taxes during the period of his participation in the conspiracy. This suggests that Mireles knew that the funds in his accounts were the ill-gotten gains of a drug conspiracy. *See United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir. 1990) ("In the Rule 404(b) context, [the defendant's] failure to file income tax returns evinced his knowledge and intent concerning his illicit narcotics trafficking activities.").

Importantly, Mireles's failure to file tax returns was relevant to a contested issue at trial: Mireles's knowing involvement in the drug conspiracy. *See Gomez*, 763 F.3d at 857 ("The general guiding principle is that the degree to which the non-propensity issue actually is disputed in the case will affect the probative value of the other-act evidence."). Mireles's central defense at trial was that he was just a gullible friend who had been duped by Roque, a criminal mastermind. By placing his knowing participation at issue, Mireles increased the probative value of otherwise tangential other-act evidence, and the government was entitled to introduce evidence to rebut the argument. *E.g.*, *United States v. Gulley*, 722 F.3d 901, 907 (7th Cir. 2013) (noting that the government is "entitled to put forth evidence to rebut" the defense's theory of the case).

Mireles's argument to the contrary is difficult to follow, but he appears to contend that the district court erred because a lack of tax returns is only relevant to a non-propensity inference if there was also evidence that he had unexplained wealth. He says that there was no evidence that he personally deposited the funds or that they "accrued" to him. Nor, says Mireles, was there any evidence that he engaged in lavish spending.

Mireles's complaint that the tax returns were unaccompanied by evidence of unexplained wealth is difficult to square with the record. The evidence at trial established that Mireles opened two bank accounts that received combined deposits totaling approximately $100,000. Though anyone could make the deposits, only Mireles could withdraw the funds from the account. Given the uncontested evidence that Mireles did not have any apparent source of income during the conspiracy, his receiving and withdrawing north of six figures constitutes "unexplained wealth." *See United States v. Cardena*, 842 F.3d 959, 983 (7th Cir. 2016) (describing when evidence of unexplained wealth is relevant in a drug conspiracy case). The relevance of the tax returns does not hinge on whether Mireles deposited the funds himself or whether the funds "accrued" to him. For "[i]t it well settled that in narcotics prosecutions, a defendant's possession … of large sums of money" and his "failure to file tax returns[] are relevant to establish that the defendant lacked a legitimate source of income" and, more likely, was involved in drug dealing. *Briscoe*, 896 F.2d at 1500.

Considering all of this, the district court concluded that the probative value of the tax return evidence was not substantially outweighed by a risk of unfair prejudice. *See Gomez*, 763 F.3d at 860 ("[T]he district court must in every case assess

whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice."). Mireles makes no argument that the district court improperly weighed this evidence's probative value against the risk of unfair prejudice under Rule 403. Therefore, Mireles has waived this argument. *United States v. Butler*, 58 F.4th 364, 367–68 (7th Cir. 2023). In the interest of completeness, however, we note that the district court properly admitted the evidence and reduced any risk of unfair prejudice by offering a limiting instruction.[4]

### 2. *Admission of Flight Evidence*

The district court also admitted evidence that Mireles fled from law enforcement and escaped his first arrest. Mireles

---

[4] The court instructed the jury as follows:

> You have heard testimony and evidence that the defendant committed acts other than the ones charged in the indictment. Specifically, you have heard that the defendant failed to file tax returns in 2013, 2014, and 2015 … . Before using this evidence, you must decide whether it is more likely than not that the defendant did these acts that … are not charged in the indictment. And if you decide that the defendant failed to file tax returns in 2013, 2014, and 2015, then you may consider this evidence to help you decide whether the defendant had a legitimate source for the funds identified in his Bank of America and Chase bank accounts and, if not, whether the reason he failed to report this income was due to his knowing participation in the charged narcotics conspiracy. … You may not consider this evidence for any other purpose.

This is exactly the sort of customized limiting instruction that we have instructed courts to give upon request to "help to reduce the risk of unfair prejudice." *Gomez*, 763 F.3d at 860. We presume a limiting instruction along these lines is effective, *United States v. Moore*, 641 F.3d 812, 824–25 (7th Cir. 2011), and, again, Mireles makes no argument to the contrary.

maintains that this evidence was improperly introduced and unfairly prejudicial. We review the district court's decision to admit evidence of flight for an abuse of discretion. *United States v. Skoczen*, 405 F.3d 537, 548 (7th Cir. 2005). Flight evidence can be used to show guilt or consciousness of guilt. *Id.* Here, the evidence was used by the government to prove Mireles's consciousness of guilt.

The test that governs the admissibility of circumstantial flight evidence is outlined in *Skoczen*, where we explained "[t]he probative value of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Id.* (citing *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir. 1993)). Only the second and third inferences are at issue here.

Mireles contends that the manner and timing of his arrest undercut these inferences. He first argues that he reasonably believed he was being kidnapped by the cartel again because the officers wore plain clothes and drove rental cars, did not have badges displayed, and did not show him an indictment or arrest warrant. Thus, Mireles says, the strongest inference is that he fled out of fear, not because of his guilty conscience.

We disagree. The degree of confidence with which the jury could draw the inference of a guilty conscience is substantial. The trial evidence demonstrated that the arresting officers wore jackets or vests clearly marked "Police," announced themselves at the door, explained that they had an arrest warrant, handcuffed Mireles, and then began driving north

toward the courthouse in Los Angeles, not south toward the
border between the United States and Mexico. In light of this
substantial evidence that Mireles knew he was being ar-
rested—not kidnapped—the trial court properly admitted the
evidence of Mireles's flight. *United States v. Kord*, 836 F.2d 368,
372 (7th Cir. 1988). Although there may be competing infer-
ences to be drawn from the evidence, the "jury was entitled to
consider the inferences" to be drawn from the evidence and
determine how much weight to place on Mireles's flight. *Id.*;
*see also United States v. Clark*, 45 F.3d 1247, 1251 (8th Cir. 1995)
("The existence of other possible reasons for flight does not
render the inference [of consciousness of guilt] impermissible
or irrational."). Additionally, the district court properly gave
a limiting instruction, which we presume to be effective in
limiting any prejudice arising from this other-acts evidence.[5]
*See Gomez*, 763 F.3d at 860; *United States v. Moore*, 641 F.3d 812,
824 (7th Cir. 2011).

Mireles also makes a barebones argument that the timing
of his arrest makes the inference that he fled because of a
guilty conscience improper. He points out that his arrest

---

[5] Specifically, the district court instructed the jury that:

> You have heard testimony and evidence that the defendant com-
> mitted acts other than the ones charged in the indictment. Specif-
> ically, you have heard that … he escaped and fled from custody
> following his arrest on October 25th of 2016. Before using this ev-
> idence, you must decide whether it is more likely than not that the
> defendant did these acts that … are not charged in the indictment.
> And if you decide that the defendant escaped and fled from cus-
> tody following the arrest, then you may consider this evidence to
> help you decide whether the defendant knew he was guilty of
> committing narcotics trafficking crimes. You may not consider the
> evidence for any other purpose.

occurred more than a year after he exited the conspiracy. We recognize that we have "indicated that the chronology of events, and in particular the passage of time between the commission of a crime or the defendant being accused of a crime and his purported flight, is a material consideration in our assessment" of the probative worth of flight evidence. *United States v. Russell*, 662 F.3d 831, 851 (7th Cir. 2011). The year-long gap between Mireles's participation in the conspiracy and his arrest, however, does not help him here. Mireles knew he was under arrest; officers notified him of the reason for the arrest; and while in route to the courthouse to face these charges, Mireles fled. Moreover, Mireles fails to explain what about that time gap made the inference that he fled because of his guilty conscience improper. We decline to make any such argument on his behalf.

### 3. *The Firearm-Related Evidence*

Mireles also challenges the introduction of his conversation with Roque about obtaining a "Glock 19, Generation 4" handgun, plus a demonstrative photograph of the sort of handgun that Mireles and Roque discussed. Conceding that he did not object to this evidence at trial, Mireles now contends that the district court committed plain error in admitting it.

The problem, however, is that Mireles did not just fail to object to this evidence—he affirmatively assented to its introduction. Counsel for Mireles, during a pretrial conference, represented to the district court that he did "not have an objection" to the government's proposed use of this conversation with Roque. Further, during the trial, counsel used this conversation to draw the jury's attention to the fact that Mireles never actually obtained any firearms.

This is a textbook example of waiver—a defendant cannot profess to have no objection to certain evidence, strategically emphasize a favorable view of that evidence, and then turn around and claim error on appeal. *E.g.*, *Lundberg*, 990 F.3d at 1094; *United States v. Schalk*, 515 F.3d 768, 774 (7th Cir. 2008); *United States v. Redditt*, 381 F.3d 597, 602 (7th Cir. 2004). As the argument is waived, we will not review it. *Lundberg*, 990 F.3d at 1094.

Mireles also maintains that the government used a demonstrative photograph of a Glock handgun to highlight to the jury what type of firearm Mireles and Roque were discussing. At trial, Mireles's counsel did not object to the exhibit, so our review would be, at best, for plain error. *United States v. Gaytan*, 649 F.3d 573, 580–81 (7th Cir. 2011). Even if we understand his challenge to the demonstrative exhibit to be separate from his challenge to the substantive evidence regarding the communication about the firearm, to meet the first step of plain error review, Mireles must demonstrate that the trial court erred. *See United States v. Natale*, 719 F.3d 719, 729 (7th Cir. 2013). The demonstrative exhibit was used "to illustrate [the government expert's] testimony," which is "a classic and proper use of a demonstrative exhibit." *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 708 (7th Cir. 2013). We see no abuse of discretion in permitting the use of a photograph to illustrate properly admitted substantive evidence—the demonstrative exhibit merely depicted the sort of handgun that Mireles casually agreed to seek to acquire for Roque and was not sent to the jury room. *Natale*, 719 F.3d at 743–44 (finding no abuse of discretion in permitting a demonstrative exhibit where the defendant did not contest the introduction of the underlying substantive evidence).

Last, we note that even if Mireles had been correct that the court should not have admitted these three pieces of evidence, we would only reverse if "the 'average juror would find the prosecution's case significantly less persuasive without the improper evidence.'" *Schmitt*, 770 F.3d at 532 (quoting *United States v. Garcia-Avila*, 737 F.3d 484, 490 (7th Cir. 2013)). The evidence of Mireles's guilt was overwhelming at trial; any error in admitting these three minor pieces of evidence would have been harmless. *Skoczen*, 405 F.3d at 549.

**B. Mireles's Sentencing Challenges**

We turn now to Mireles's sentencing arguments. On appeal, Mireles maintains that the district court committed two procedural errors in calculating his guidelines range and imposed a substantively unreasonable sentence. Because we resolve procedural issues before substantive reasonableness challenges, we will look first at Mireles's two procedural challenges to his sentence. *See Gall v. United States*, 552 U.S. 38, 51 (2007) (noting that courts resolve procedural issues before substantive reasonableness challenges).

### 1. *Drug Quantity*

Mireles argues the district court procedurally erred by attributing too many drugs to him. We start here because the drug quantity calculation drove Mireles's base offense level. We review a district court's drug quantity calculation for clear error. *United States v. Freeman*, 815 F.3d 347, 353 (7th Cir. 2016). The quantity of drugs attributable to a defendant at sentencing must be proven by a preponderance of the evidence. *Id*. In a drug conspiracy, a defendant is responsible "not only for drug quantities directly attributable to him but also for amounts involved in transactions by coconspirators that were

reasonably foreseeable to him." *Id.* (quoting *United States v. Turner*, 604 F.3d 381, 385 (7th Cir. 2010)).

"Since drug networks and dealers rarely keep transparent and reliable accounts, determining drug quantities under the Guidelines is not an exact science, and district courts may make reasonable estimates based on the evidence." *United States v. Jones*, 56 F.4th 455, 506 (7th Cir. 2022) (internal citations omitted). In estimating the drug quantity, the district court is allowed to use "testimony about the frequency of dealing and the amount dealt over a specified period of time." *Freeman*, 815 F.3d at 354 (quoting *United States v. Hernandez*, 544 F.3d 743, 746 (7th Cir. 2008)). This information, however, must bear "sufficient indicia of reliability to support its probable accuracy." *Freeman*, 815 F.3d at 354 (quoting

*United States v. Hankton*, 432 F.3d 779, 789 (7th Cir. 2005)). The district court concluded that Mireles was accountable for at least 140 kilograms of cocaine and 10 kilograms of heroin. The court reached this tally by relying on the evidence of the minimum quantity of drugs that was shipped to Chicago while Mireles was personally present in the city. According to Mireles's flight records and the Amtrak Express records, the conspiracy shipped 15 packages to Chicago while Mireles was there. Roque testified that each one of those packages contained between 10 and 40 kilograms of cocaine. The trial evidence also demonstrated that another coconspirator, Angelica Cervantes, retrieved 10 kilograms of heroin from Union Station while Mireles was in Chicago. Mireles even tried, though unsuccessfully, to create a diversion so that Cervantes would not be stopped by law enforcement. Using this reliable evidence, the district court determined that 14 of the 15 packages contained at least 10 kilograms of cocaine each, and that the

fifteenth package contained the 10 kilograms of heroin that Cervantes retrieved.

The district court permissibly adopted the most conservative figure the evidence supported. *Freeman*, 815 F.3d at 354. That tally created a "reasonable estimate[] of drug quantity based on evidence in the record," *United States v. Austin*, 806 F.3d 425, 431 (7th Cir. 2015), and therefore was not clearly erroneous, *Freeman*, 815 F.3d at 353.

Mireles contends, however, that he can only be held accountable for the five packages that he personally retrieved from Union Station. Thus, Mireles contends the best estimate of his drug quantity calculation is 50 kilograms of cocaine, not 140. Mireles argues that the drugs delivered to Chicago, picked up by a different co-defendant, and managed by others in the drug conspiracy were not reasonably foreseeable to Mireles and should not have been included in the court's relevant conduct analysis when calculating Mireles's drug quantity calculation.

Mireles's argument misapprehends how conspiracy liability works. As a general rule, the reasonably foreseeable crimes of one conspirator are attributable to all coconspirators. *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946). This rule of coconspirator liability also applies at sentencing, U.S.S.G. § 1B1.3(a)(2), and "each conspirator is responsible for both the drug quantities directly attributable to him and amounts involved in reasonably foreseeable dealings by co-conspirators." *Austin*, 806 F.3d at 431. Thus, Mireles's sentencing exposure is not driven solely by the drugs he personally handled; he is also accountable for the reasonably foreseeable acts of his coconspirators, including the drugs they retrieved. *Freeman*, 815 F.3d at 353.

The district court did not err, clearly or otherwise, in concluding that Mireles was accountable for 140 kilograms of cocaine and 10 kilograms of heroin. The evidence established Mireles's knowing participation in a tentacular drug conspiracy that shipped kilogram-quantities of cocaine and other drugs on a near-weekly basis. Mireles knew he was but one cog in the machine of that enterprise. Mireles personally retrieved at least five packages from Union Station, provided cover to Cervantes when she retrieved another package, and he was present for the unboxing and distribution of drugs retrieved by others. While in Chicago, Mireles lived in stash houses, stacked cocaine on tables, and exchanged kilograms of the drugs—whether he retrieved them from Union Station or not—for duffle bags of cash. He also knew what his coconspirators were doing, and thus those transactions were also foreseeable to Mireles. Upon review of the record, we conclude that the district court did not err in its drug quantity calculation for Mireles.

### 2.  The Sentencing Enhancements

Mireles also challenges two Sentencing Guideline enhancements the district court imposed based on Mireles's escape from law enforcement. On appeal, Mireles argues that he was punished twice based on the same conduct.

### a.  Obstruction and Related Enhancements

To Mireles's base offense level, the district court added two 2-level enhancements based on Mireles's escape from arrest by law enforcement. The first penalized Mireles for obstructing justice. U.S.S.G. § 3C1.1. The second penalized Mireles for recklessly endangering others during his flight from law enforcement. *Id.* § 3C1.2. We review a challenge to the

application of a Guidelines enhancement de novo, though we review the court's underlying factual findings for clear error. *United States v. Barker*, 80 F.4th 827, 834 (7th Cir. 2023). Before moving to the analysis, we will describe each enhancement because the overlap between the two is important.

Under § 3C1.1 of the United States Sentencing Guidelines, a defendant's offense level is increased by 2 levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense … .

U.S.S.G. § 3C1.1. The application notes to § 3C1.1 list several examples of conduct that is not covered by this enhancement including "avoiding or fleeing from arrest." U.S.S.G. § 3C1.1 cmt. n. 5(D). But, in interpreting that provision, we have clarified that "some efforts to evade authorities through flight" can warrant this enhancement. *United States v. Cisneros*, 846 F.3d 972, 975 (7th Cir. 2017). The ultimate question is whether the "defendant's conduct evidences a willful intent to obstruct justice." *Id.* "Accordingly, we have distinguished between 'panicked, instinctive flight,' generally in the immediate aftermath of the crime," which does not warrant the enhancement, "and 'calculated evasion' constituting a deliberate attempt to frustrate or impede an ongoing criminal investigation," which does. *Id.* (quoting *United States v. Schwanke*, 694 F.3d 894, 897 (7th Cir. 2012) (collecting cases)); *see also United States v. Nduribe*, 703 F.3d 1049, 1053 (7th Cir. 2013).

The Guidelines also prescribe, pursuant to § 3C1.2, a two-level increase to the defendant's offense level if "the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. In addition, for this enhancement to apply, the defendant must have known he was fleeing from law enforcement. *United States v. Hibbett*, 97 F.4th 477, 481 (7th Cir. 2024).

One more point. The Sentencing Guidelines often permit double counting—the practice of basing multiple enhancements on the same underlying conduct. *United States v. Vizcarra*, 668 F.3d 516, 519 (7th Cir. 2012). But there are exceptions. *Id.* ("[I]n the context of guidelines sentencing, double counting is generally permissible unless the text of the guidelines expressly prohibits it."). Relevant here, the district court cannot impose enhancements under § 3C1.1 and § 3C1.2 "solely on the basis of the same conduct." § 3C1.2 n.1.

### b.   *Applying the Obstruction Enhancements*

At sentencing, the parties and the court appear to have dealt with these two enhancements, § 3C1.1 and § 3C1.2, in tandem. When the district court was calculating the appropriate guidelines range, Mireles objected to both enhancements and the government responded in kind. The district court recognized that there were two enhancements at issue and sought clarification for why that was the case. The government then responded that, in addition to "the reckless operation of the vehicle," Mireles was "a fugitive." The parties' discussion then focused on whether Mireles knew at the time of the arrest that he had been charged by indictment. After concluding that Mireles likely knew that he was under indictment, the district court ruled as follows: "So I'm going to give

both -- both levels for the specific offense characteristics of obstruction, one for the action against the agent, and one for his evading the administration of justice … for avoiding that indictment."

On appeal, Mireles contends that the court should not have imposed either enhancement. He did not obstruct justice, he argues, because he escaped only from arrest, not custody. *Compare* U.S.S.G. § 3C1.1 app. ns.4(E) & 5(D). He also contends he did not recklessly endanger anyone because a civilian witness's testimony established that he drove away "at moderate speed," which "contradicted the findings of the district court." He also contends that imposing both enhancements violates § 3C1.2 n.1, which prohibits double counting under §§ 3C1.1 & 3C1.2.

Mireles's argument about the reckless endangerment enhancement is a nonstarter. The district court expressly credited Agent Goteva's testimony that Mireles—after running across at least five lanes of highway traffic, down an embankment, and then stealing a pickup truck—drove straight at her, prompting her to open fire to protect herself and others. That finding, which Mireles does not challenge as clearly erroneous, *United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003), is essentially dispositive.

Our inquiry is whether the district court clearly erred in concluding that Mireles recklessly created a substantial risk of harm, *United States v. Brown*, 716 F.3d 988, 995–96 (7th Cir. 2013). The district court credited Agent Goteva's account of Mireles's escape rather than that of a civilian witness who described Mireles's escape in milder terms. But, with exceptions not relevant to this appeal, the district court's credibility determination "can virtually never be clear error." *Anderson v.*

*City of Bessemer*, 470 U.S. 564, 575 (1985). Accordingly, the court's imposition of this enhancement is appropriate based on the nature of Mireles's escape. *See United States v. Smith*, 210 F.3d 760, 762 (7th Cir. 2000). The officers, other drivers, the construction workers, and other passersby were all placed at a substantial risk of serious harm based on Mireles's reckless escape. *See Brown*, 716 F.3d at 995–96.

The district court's decision to impose the obstruction of justice enhancement is more enigmatic. Largely because of the way the sentencing hearing unfolded, we are left unsure of the factual basis for the obstruction of justice enhancement. *See United States v. Clayborne*, 105 F.4th 965, 969 (7th Cir. 2024) (noting that the record must be "sufficient to permit the reviewing court 'to discern the considerations which motivated the district court's sentencing decision.'"). The parties' discussion of the obstruction enhancement, and the district court's engagement with that discussion, frequently overlaps with the discussion about the manner of Mireles's escape. The transcript seems to suggest that the district court may have imposed the enhancement because Mireles, knowing he was under indictment, did not turn himself in. But merely failing to surrender voluntarily does not warrant an obstruction of justice enhancement. *Nduribe*, 703 F.3d at 1051.

The district court also suggested, however, that Mireles was actively avoiding the indictment. This sort of obstructionist behavior could support the enhancement if there was evidence in the record that Mireles's actions were "likely to make the investigation or prosecution significantly more costly or less effective than it would otherwise have been." *Id.* at 1053. The problem is that, from our vantage point and based on this record, we see no evidence that Mireles did anything after he

escaped to make his prosecution "significantly more costly or less effective." *Id.* That's important because application note 5(D) says that "avoiding or fleeing from arrest" is "ordinarily" not obstruction of justice. *See id.* at 1051–53 (considering U.S.S.G. 3C1.1 app. n.5(D)). The question, in essence, is whether the defendant engaged in "calculated evasion" in a "deliberate attempt to frustrate or impede an ongoing criminal investigation." *Cisneros*, 846 F.3d at 975.

There is a gap in the record about whether, after Mireles made his escape, he engaged in "calculated evasion." *Id.* We see no evidence in the record that Mireles altered his appearance, fled the area, or assumed a new identity, among other possibilities for concluding he was intentionally evading prosecution. *E.g.*, *id.*; *Nduribe*, 703 F.3d at 1052; *Gonzalez*, 608 F.3d at 1007; *Porter*, 145 F.3d at 902. More importantly, if that evidence exists, the district court did not point to it. *Clayborne*, 105 F.4th at 969. As the record stands, all we know is that after two attempts to locate Mireles, he was found at home, asleep in his bed. More to the point, we must be able to review the district court's reasoning for imposing a sentencing enhancement. *See United States v. Garcia-Oliveros*, 639 F.3d 380, 382 (7th Cir. 2011). Here the transcript is unfortunately too muddled because of the way this issue was presented to the district court for us to discern the court's basis for the enhancement beyond Mireles's failure to turn himself in, which is not enough. *Nduribe*, 703 F.3d at 1051.

Even so, we recognize that this was not the primary thrust of the parties' arguments at sentencing as they focused primarily on whether Mireles knew he was under indictment. Accordingly, on remand, "[i]f the government possesses additional evidence to support [this] enhancement, then … the

district court has discretion to grant it an opportunity to supplement the record with that evidence." *United States v. Hyatt*, 28 F.4th 776, 785 (7th Cir. 2022). It may be that, in the end, both enhancements are appropriate because different conduct supports each. *See* U.S.S.G. § 3C1.2 app. n.1. At this stage, however, we order a limited remand to reassess the propriety of applying the obstruction of justice enhancement to Mireles's sentence, and, if necessary, to recalculate Mireles's guidelines range and resentence him under the correct range. *See United States v. Adams*, 746 F.3d 734, 744–45 (7th Cir. 2014) (explaining that the purpose of a limited remand is to focus the parties' attention on the scope of the remand).[6]

### III.   CONCLUSION

For these reasons, we AFFIRM Mireles's conviction, VACATE his sentence, and REMAND for further proceedings consistent with this opinion.

---

[6] We do not reach Mireles's substantive reasonableness argument because we find that, on this record, the factual basis for the obstruction of justice enhancement is unclear. *See Gall v. United States*, 552 U.S. 38, 51 (2007) (noting that courts resolve procedural issues before substantive reasonableness challenges).